## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SHARON D. RICHARDSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 13-00826 (RC) |
| | : | | |
| v. | : | Re Document No.: | 40 |
| | : | | |
| GEORGE PETASIS, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

### MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Sharon D. Richardson, an African-American female, was an employee of

Defendant The Johns Hopkins University ("JHU") from April 2011 to January 2013.  Ms.

Richardson brings this civil action against JHU and four of its employees or former employees,

Defendants George Petasis, Shanna Hines, Deborah Grandval,[1] and Myron Kunka (collectively,

the "Individual Defendants"), for race discrimination and retaliation in violation of Section 1981

of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, and Title 2 of the

District of Columbia Human Rights Act of 1977 ("DCHRA").  *See* Am. Compl., ECF No. 27.

Ms. Richardson alleges that JHU, through the conduct of the Individual Defendants,

discriminated against her with respect to the terms and conditions of her employment because of

her race (Counts I–III), created a hostile work environment (Count VI), and retaliated against her

---

[1]     Defendants' motion states that the Amended Complaint incorrectly identifies this
Defendant as "Debbie Grandval."  *See* Mem. Supp. Defs.' Mot. Summ. J. at 1, ECF No. 40-1.

for her complaints of race discrimination (Count V) and that the Individual Defendants aided and

abetted the discriminatory and retaliatory conduct (Count IV). [2]  *See id.* ¶¶ 121–50.

Before the Court is Defendants' motion seeking summary judgment on all counts of the

Amended Complaint.  *See* Defs.' Mot. Summ. J., ECF No. 40.  Upon consideration of the

parties' arguments in support of and in opposition to the motion[3] and the record before the Court,

---

[2]       Ms. Richardson's Amended Complaint is inartfully drafted with respect to its claims
against the Individual Defendants and, apart from the aiding and abetting claim, does not make
clear which claims are brought against which defendants.  For example, Count I, the
discrimination claim brought under Section 1981, references "Defendants' conduct" but does not
claim that the Individual Defendants are liable for discrimination under that statute.  *E.g.,* Am.
Compl. ¶¶ 123–24.  On the other hand, Count III, the discrimination claim brought under the
DCHRA, alleges that "Defendant JHU-SAIS discriminated against Plaintiff" and does not refer
to the Defendants in plural form.  *Id.* ¶ 130.  In a third variation, Count V, the retaliation claim,
references Section 1981, Title VII, and the "DCORC" (which the Court interprets to mean the
DCHRA) and "Defendants' acts and/or omissions."  *Id.* ¶¶ 142, 143.  In yet another variation,
Count VI, the hostile work environment claim, does not reference any particular statute but
references "Defendants' acts and/or omissions."  *Id.* ¶¶ 146–49.  Both parties treat the Amended
Complaint as bringing direct claims for discrimination and retaliation against only JHU and
bringing a claim of aiding and abetting violations of the DCHRA against each of the Individual
Defendants.  The Court does the same.

[3]       The quality of Ms. Richardson's brief in opposition to Defendants' motion for summary
judgment and its related exhibits leaves much to be desired.  For example, Ms. Richardson's
counsel filed numerous exhibits along with her opposition brief but, without explanation, filed
additional exhibits the following day.  *See* ECF No. 43.  Those additional exhibits were filed out
of order.  Even within the exhibits, some pages are inexplicably out of order.  *See, e.g.,* Pl.'s Ex.
5, ECF No. 42-8.  Moreover, several of the exhibits merely consist of one page with a
handwritten note referring to another exhibit.  *E.g.,* Pl.'s Ex. 46, ECF No. 43-8 ("See Exhibit
40").  Ms. Richardson's counsel then filed a final exhibit as an attachment to a certificate of
service the following day.  *See* Pl.'s Ex. 19, ECF No. 44-1.  Ms. Richardson's counsel gave no
notification, let alone any explanation, for filing the exhibit in this manner.  Additionally, despite
three separate filings of exhibits over the course of three days, certain exhibits cited in the
opposition brief appear to be missing from the record:  Plaintiff's Exhibits 24, 40, 41, 42, 44, and
47.  The problems are not limited to haphazard filings.  Among other things, Ms. Richardson's
own 40-page affidavit is cited throughout the opposition brief and the Statement of Facts in
Dispute as one of the primary sources she relies upon in opposition to summary judgment, but
there are no pincites to the declaration, making it very difficult to understand what portion is
relied upon.  *See* Pl.'s Opp. Defs.' Mot. Summ. J., ECF No. 42; Pl.'s Stmt. Facts In Dispute, ECF
No. 42-2.  Local Civil Rule 7(h) requires a party opposing a motion for summary judgment to
include in her statement of disputed facts "references to the parts of the record relied on" for
support.  D.D.C. Local Civ. R. 7(h)(1).  "The rule embodies the thought that judges 'are not like

2

the Court will grant the motion in part and deny the motion in part for the reasons explained below.

## II.  FACTUAL BACKGROUND[4]

JHU's Paul H. Nitze School of Advanced International Studies ("SAIS") is a global educational institution that maintains its primary campus in Washington, D.C.  Its Office of Information Technology provides computing support for SAIS students, faculty, and staff, including computing and audio-visual support for SAIS events.  *See* Defs.' Stmt. Facts Not In Dispute ("Defs.' SOF") ¶ 1, ECF No. 40-2.  Plaintiff Sharon Richardson began working for SAIS's Office of Information Technology on April 11, 2011 and resigned on January 22, 2013.  *See id.* ¶ 6.

### A.  JHU's Hire of Ms. Richardson and Ms. Richardson's Responsibilities

Ms. Richardson was hired as an Information Technology Manager with the title of Director of Operations and maintained this title throughout her employment.[5]  *See* Defs.' Ex. 2,

---

pigs, hunting for truffles buried in briefs' or the record."  *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Nevertheless, the Court has expended considerable effort to determine what portions of the record Ms. Richardson relies upon in her opposition.  Finally, Defendants also make several arguments concerning admissibility issues raised by the opposition.  *See* Defs.' Reply Supp. Mot. Summ. J. at 2–8, ECF No. 46.  The Court addresses these arguments, *infra*, to the extent that they may be relevant to the Court's analysis.

[4]     In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, where the facts are disputed, the Court views the evidence in the light most favorable to Ms. Richardson.

[5]     In one portion of her response to Defendants' Statement of Facts, Ms. Richardson disputes this title, stating that her proper title was "Information Technology Operating Unit Director."  Pl.'s Stmt. Facts In Dispute ¶ 3, ECF No. 42-2.  Ms. Richardson does not argue that this dispute is material to her claims, but the Court is compelled to note that the evidence, a formal JHU description of the position and its responsibilities dated April 2011 that Ms. Richardson does not dispute, states that her title was Director of Operations.  *See* Defs.' Ex. 2,

ECF No. 40-4.  Defendant George Petasis, who was the Chief Information Officer ("CIO") of

SAIS and Ms. Richardson's superior throughout her employment, interviewed both Ms.

Richardson and Defendant Deborah Grandval, who is Caucasian, for the position.  *See* Defs.'

SOF ¶¶ 4, 7; *see also* George Petasis Dep. Tr. at 9:11–18, Defs.' Ex. 4 ("Petasis Dep. Tr."), ECF

No. 40-6.[6]  At the time, Mr. Petasis concluded that Ms. Richardson was more qualified for the

position than Ms. Grandval due to the experience that Ms. Richardson described on her resume,

and he selected Ms. Richardson for the position.  *See* Defs.' SOF ¶¶ 7–9; *see also* Petasis Dep.

Tr. at 9:21–10:1; *id.* 11:4–6.  According to Ms. Richardson, Mr. Petasis told her during her

interview for the position that "he did not need a technical person" and that she "could be trained

later."  Aff. Sharon D. Richardson ¶ 7, Pl.'s Ex. 7 ("Richardson Aff."), ECF No. 42-10.

    As the Director of Operations, Ms. Richardson supervised approximately eight

employees.  *See* Defs.' SOF ¶ 11.[7]  Her responsibilities included overseeing audio-visual events

at SAIS, managing the Service Desk, which provides help to users with technology issues and

requests for service, assisting SAIS faculty, staff, and students with their technology needs,

---

ECF No. 40-4.  Moreover, in other portions of her response to Defendants' Statement of Facts, Ms. Richardson does not dispute Defendants' reference to her as the Director of Operations.  *See, e.g.*, Pl.'s Stmt. Facts In Dispute ¶ 11.  The Court also observes that Ms. Richardson alleged that she was the "Director of Information Technology" in both her Amended Complaint and the affidavit that she submitted in opposition to Defendants' motion for summary judgment.  Am. Compl. ¶ 20; Aff. Sharon D. Richardson at ¶ 3, Pl.'s Ex. 7, ECF No. 42-10.

[6]    For ease of reference, the Court's citations to deposition transcripts are to the page and line numbers of the transcripts, rather than the page numbers of the exhibits submitted by the parties.

[7]    Defendants' Statement of Facts cites Ms. Richardson's deposition testimony in support of this fact, but the cited portion is missing from the excerpts provided to the Court.  *See* Defs.' Ex. 1-A, ECF No. 41-1.  In this instance, and in a few other instances of the same issue, the error is immaterial, because Ms. Richardson does not dispute Defendants' factual statement.  *See* Pl.'s Stmt. Facts In Dispute ¶ 11.  The Court notes other instances of this issue only where the error affects its analysis.

managing the IT budget and staff, providing IT support for JHU's Carey Business School, and assisting Mr. Petasis with IT initiatives.  *See id.*; Defs.' Ex. 2.  The JHU Staff Handbook also states that all employees are responsible for "perform[ing] duties assigned by [their] supervisor even if not included in [their] job description."  Defs.' Ex. 5 at JHU00454–55, ECF No. 40-7.

### B.  Beginning of Ms. Richardson's Employment

The signs of a future strained relationship between Ms. Richardson and Mr. Petasis were evident early in Ms. Richardson's employment.  When Ms. Richardson began working in April 2011, Mr. Petasis was out of the office on a two-week vacation, and when he returned to the office he and Ms. Richardson had a good and pleasant working relationship.  *See* Defs.' SOF ¶ 15.

On or about May 5, 2011, however, Mr. Petasis yelled at Ms. Richardson in front of Mohammad Elahi, one of Ms. Richardson's staff members.  *See id.* ¶ 16; Defs.' Ex. 7, ECF No. 40-9 (handwritten note dated May 11, 2011 describing the incident).  Ms. Richardson states that Mr. Petasis "yelled and screamed at me in a physically hostile manner" and was "so close that I could feel his breath and smell the coffee on his breath."  Richardson Aff. ¶ 11.  Ms. Richardson testified that she confronted Mr. Petasis about his conduct soon afterwards and told him that she found it "offensive."  *See* Sharon Richardson Dep. Tr. at 222:8–223:21, Defs.' Ex. 1-B ("Richardson Dep. Tr."), ECF No. 41-2.  She testified that their interaction was calm and that it ended by shaking hands.  *See id.*  Ms. Richardson also mentioned this incident to Defendant Shanna Hines, an African-American woman who was the Human Resources Manager during Ms. Richardson's employment, shortly thereafter.  *See* Defs.' SOF ¶ 5; Richardson Dep. Tr. at 223:22–224:15.  Ms. Richardson states, however, that Mr. Petasis frequently yelled and screamed at her and invaded her personal space throughout her employment.  *See* Richardson

Aff. ¶ 10.  Nevertheless, Ms. Richardson testified that from May to September 2011, she and Mr.

Petasis had a "good relationship" and treated each other with respect.  *See* Richardson Dep. Tr. at

262:16–263:2, Defs.' Ex. 1-C, ECF No. 41-3.

Mr. Petasis states that within the first few months of Ms. Richardson's employment, he

realized that Ms. Richardson's "technical competence was not at the level [he] had understood it

to be based on her resume and [his] interview of her."[8]  Aff. George Petasis ¶ 4, Defs.' Ex. 6

("Petasis Aff."), ECF No. 40-8.  In July 2011, he hired Ms. Grandval as an IT Manager reporting

directly to him with the title of IT Project Leader.  *See* Defs.' SOF ¶ 33; Aff. Shanna Hines ¶ 14,

Defs.' Ex. 3 ("Hines Aff."), ECF No. 40-5; Pl.'s Ex. 12, ECF No. 42-15.

### C.  Physical Incident Involving Mr. Petasis and First Meeting with Human Resources

Ms. Richardson states that on or about September 27, 2011,[9] Mr. Petasis touched her

shoulder in a way that she felt was inappropriate.  *See* Defs.' SOF ¶ 18.  During her deposition,

Ms. Richardson testified that on that day, while she and Mr. Petasis were working in a "very

tight," small control room, Mr. Petasis, with his body in "very close proximity," briefly squeezed

and rubbed her shoulder.  Richardson Dep. Tr. at 235:17–240:19.  She testified that she found

this physical contact offensive.  *See id.* at 240:22–241:17.  The next day, Ms. Richardson

confronted Mr. Petasis about the incident, telling him that he had made her uncomfortable.  *See*

---

[8]     Ms. Richardson challenges Mr. Petasis's testimony by claiming that on a few occasions during her first few months of employment, Mr. Petasis made comments indicating that he had no complaints about her work.  *See* Pl.'s Stmt. Facts In Dispute ¶ 13.  Her only support for this proposition is a general citation to her 40-page affidavit without any pincite.  *See id.*  It is not clear what portion of her affidavit she references.  On the other hand, Defendants do not provide a copy of Ms. Richardson's resume or explain which portions of it Mr. Petasis believed to be overstated.

[9]     In a "Memorandum For Record" dated September 29, 2011, discussed, *infra*, Ms. Richardson referred to this incident as occurring on September 20, 2011.  *See* Defs.' Ex. 8 at SDR000993, ECF No. 40-10.

*id.* at 245:3–11.  Mr. Petasis responded by telling her that he "respect[s] that" and that he "didn't mean anything."  *See id.* at 245:16–18.  Ms. Richardson felt satisfied with his response at the time, which she characterized as courteous.  *See id.* at 246:19–20; *id.* at 248:4–5.  Ms. Richardson does not attribute Mr. Petasis's actions to racial discrimination.  *See* Defs.' SOF ¶ 21; Richardson Dep. Tr. at 248:8–11.

Two days later, on September 29, 2011, at her request, Ms. Richardson met with Ms. Hines and Defendant Myron Kunka, the Associate Dean for Finance and Administration at the time, who was responsible for overseeing Human Resources and the Office of Information Technology, to generally discuss her and her staff's concerns about Mr. Petasis.  *See* Defs.' SOF ¶ 22.  After the meeting, Ms. Richardson created a "Memorandum For Record" memorializing her recollection of the conversation.  *See* Defs.' Ex. 8, ECF No. 40-10.  According to Ms. Richardson's memorandum, the purpose of the meeting was to, first, "[m]ake management formally aware" that the Office of Information Technology was a "hostile" environment and, second, to "share concerns expressed by my direct reports (staff/personnel) and myself."  *Id.* at SDR000992.  Ms. Richardson stated that her staff had expressed concerns regarding Mr. Petasis's "inappropriate and unprofessional behavior" and that she was doing her job "to project that information forward" by putting it "on record."  *Id.*  She stated that her staff felt "threatened and bullied" by Mr. Petasis for a few different reasons.  *Id.*  She stated, for example, that she was informed that Mr. Petasis "has a history of volatile actions such as yelling, intimidation, harassment and even pounding his fist on the desk."  *Id.* at SDR000992–93.  She also stated that her male staff had complained about Mr. Petasis grabbing their shoulders and shaking them.  *See id.* at SDR000993.

Ms. Richardson also told Ms. Hines and Mr. Kunka that some of her male staff wanted Mr. Petasis to stop referring to them as "his boys." *Id.* at SDR000992. She wrote in her memorandum: "They find this reference offensive and degrading, example: One staff is of [Philippians [sic] Origin] and another is [Ethiopian Nationality]." *Id.* (punctuation in original). During her deposition testimony, Ms. Richardson provided some clarification. She testified that the members of her staff that she referenced were Michael Berbano, who she said was of Filipino origin, and Mr. Elahi, who she said was of Iranian origin.[10] *See* Richardson Dep. Tr. at 263:13–18; *id.* at 270:11–16. She stated that Mr. Berbano complained to her directly and that Mr. Petasis "referred to Moe Elahi in my presence, asking me, 'How is your boy?'" *Id.* at 263:14–18; *id.* at 272:8–274:18. She could not recall whether she informed Mr. Elahi that Mr. Petasis referred to him using the term "boy" or whether Mr. Elahi ever complained to her about it. *See id.* at 275:11–19. She testified that, as an African-American, she associates the term "boy" with slavery and found it racially offensive and discriminatory. *See id.* at 272:2–7. She said that Mr. Berbano did not express any feelings of racial discrimination in his complaint to her but that he told her that he felt it was derogatory because he is a "grown-ass man." *See id.* at 273:13–274:7. Her memorandum does not reflect that she expressed the racial connotations she made with slavery to Ms. Hines and Mr. Kunka, and Ms. Richardson testified that the memorandum was, to her knowledge, a complete and accurate representation of what she discussed at the meeting. *See* Richardson Dep. Tr. at 275:20–276:5.

---

[10]     During her deposition testimony, Ms. Richardson did not indicate that there was a third staff member of Ethiopian origin who complained to her, discussing only Mr. Berbano and Mr. Elahi as the employees that Mr. Petasis referred to as "his boys." She appears, therefore, to have been confused concerning Mr. Elahi's ethnicity or national origin.

**D.  Incidents with Mr. Petasis and Ms. Grandval in January and February 2012**

On January 24, 2012, Mr. Petasis had a heated discussion with Ms. Richardson in which she claims that he yelled at her regarding a meeting that Ms. Richardson had requested with Human Resources earlier that month.  *See* Richardson Aff. ¶ 28; Pl.'s Ex. 11, ECF No. 42-14. Ms. Richardson summarized that discussion in a memorandum dated two days later and addressed to Mr. Petasis.[11]  *See* Pl.'s Ex. 11.  According to the account provided in the memorandum, Ms. Richardson requested the meeting to discuss issues related to staffing and Mr. Petasis yelled at her regarding the need for the meeting and for the two hours' notice that Ms. Richardson provided him in advance of the meeting.  *See id.* at JHU00246.  In the memorandum, Ms. Richardson wrote she "felt very uncomfortable and fearful to remain in the room with you" and referenced other purported instances of Mr. Petasis screaming at her and other employees. *Id.*  She also asked, "Is this rough and harsh behavior because of my gender, race or ethnicity?" *Id.*  She closed the memorandum by stating that she would request to meet with Mr. Petasis, his supervisor, and Human Resources.  *See id.* at JHU00247.

On February 22, 2012, Ms. Richardson had an encounter with Ms. Grandval that Ms. Richardson characterizes as threatening.  *See, e.g.,* Richardson Dep. Tr. at 323:17–18, Defs.' Ex. 1-D, ECF No. 41-4.  According to Ms. Richardson's testimony, Ms. Grandval came to her office to ask her a question, and, because Ms. Richardson was doing something else at the time, she did not respond.  *See id.* at 322:6–9.  Ms. Grandval then, according to Ms. Richardson's testimony, yelled at her that she asked her a question and Ms. Richardson again did not respond.  *See id.* at

---

[11]      It is unclear whether this memorandum was actually written for Mr. Petasis.  In a subsequent memorandum from Mr. Petasis to Ms. Richardson over one month later, discussed, *infra*, Mr. Petasis referred to this document as a "Memo to Human Resources that was addressed to me."  Pl.'s Ex. 22, ECF No. 42-23.  There is no indication on the face of the memorandum as to where and when it was delivered.

322:8–12.  Ms. Richardson testified that Ms. Grandval then "lunged in my face, and her breath

was on my breath," yelling at her, "When I ask you something, you need to tell me."  *Id.* at

322:13–323:8.  Ms. Richardson claims that shortly after this incident, Mr. Petasis removed her

access to the calendar on Microsoft Outlook but that he did not remove Ms. Grandval's access,

which impeded her ability to perform her work.  *See* Defs.' SOF ¶ 28.

    A week later, on February 29, 2012, Mr. Petasis wrote a memorandum to Ms. Richardson

in response to her memorandum dated January 26, 2012 and in advance of a meeting that the two

had with Ms. Hines that same day.  *See* Pl.'s Ex. 22, ECF No. 42-23.  Mr. Petasis disputed the

factual account that Ms. Richardson provided in her memorandum, writing:  "It was shocking to

see things twisted around and styled in a way where you appear to be the victim; discussions

taken out of context, and comments often distorted, in order to present me in the worst possible

way."  *Id.* at JHU00235.  He stated that he had been trying to accommodate Ms. Richardson's

"hostile attitude, body language and behavior at meetings, as well as emails, these past ten

months," and that he had attempted to address issues that she brought to him and "reassure you

that nobody was out to get you and that we are all part of the same team."  *Id.*  He also addressed

the specific incidents that Ms. Richardson discussed in her memorandum.  With respect to their

meeting on January 24, 2012, he stated that "[i]f there was one person that raised their voice

during this conversation it was you while you were trying to explain your earlier emails" and that

he "was actually under the impression that the conversation went well," given that Ms.

Richardson thanked him at its conclusion and appeared to be in a "much better mood."  *Id.* at

JHU00236.  He stated that he was therefore surprised when he saw his words "twisted and

warped in your email and you quoting me out of context."  *Id.*

Mr. Petasis also addressed what he characterized as Ms. Richardson's unprofessional behavior and need for improvement, writing, in part:  "[T]hings need to change going forward and beyond your body language, the tone in your voice, and the way you deal with your peers, you need to also address the manner in which your [sic] write some of your emails where at times you make me feel that I'm the one working for you and not the other way around . . . ."  *Id.* at JHU00238.  He encouraged Ms. Richardson to "come see me if you're not getting the kind of response you are expecting" and told her that she should "stop feeling insecure about [her] job." *Id.*  He stated that he would discuss these issues during their upcoming meeting with Human Resources.  *See id.*  Ms. Hines submits an affidavit characterizing Mr. Petasis's memorandum as "counseling [Ms. Richardson] on ways she needed to improve her work performance."  Hines Aff. ¶ 3.  *See also* Petasis Dep. Tr. at 36:21–37:3 (testifying that this portion of the memorandum "was guidance that, in my mind, was – was prescribing the course of action she had to take, corrective action she had to take").

Ms. Richardson met with Mr. Petasis and Ms. Hines on the same day as Mr. Petasis's memorandum.  Ms. Hines states that she met with the two of them "to try to help them resolve their conflict" and that during this meeting, Ms. Richardson "cited as a source of conflict the fact that Petasis had yelled at her in May 2011."  Hines Aff. ¶ 4.  Ms. Richardson also discussed her encounter with Ms. Grandval on February 22.  In an e-mail that Ms. Richardson sent to Ms. Hines on March 1, 2012 following up on their meeting, she summarized the incident with Ms. Grandval, referring to her "advanc[ing] toward my face" and stating that she "felt this behavior was unacceptable in the work environment, unprofessional more importantly, threatening." Defs.' Ex. 11, ECF No. 40-13 (emphasis omitted).  Ms. Richardson's account does not indicate

that she raised any concerns regarding race discrimination by either Mr. Petasis or Ms. Grandval

to Ms. Hines or Mr. Petasis.

### E.  Incident with Ms. Grandval in May 2012

According to Ms. Richardson, she had another, more serious encounter with Ms.

Grandval on May 9, 2012.  Ms. Richardson testified during her deposition that on that day Ms.

Grandval came into her office following a meeting with Mr. Petasis, closed the door, leaned

over, and said to her, "I know exactly where you park your car, and I am going to hurt you, and I

will get your job. . . . And nobody will believe you."  Richardson Dep. Tr. at 336:3–9.  *See also*

*id.* at 334:8–341:3 (discussing the incident).  In a contemporaneous e-mail that Ms. Richardson

sent to Mr. Petasis and Ms. Hines the same day, she provided another description.  *See* Defs.' Ex.

12, ECF No. 40-14.  She wrote:

> Debbie G. came into my office and closed my door and proceeded
> with the same discussion about "why I sent the email"?  She was
> antagonistic and badgering…….The purpose of our previous
> meeting was to bring closure….why did she need to badger me
> again? I'm not comfortable with her behind closed doors, because,
> of the last episode where she lunged over my desk in my face…..So
> I opened the door….She and I disagreed and I told her I was not
> going to engage any further in this confrontational discussion…. I
> asked "what she needed or how may I assist her"?  She continued to
> badger me about the email and Sais Store, and etc.  Why would she
> continue to pursue and badger me about the very discussion you
> advised in your office 10 minutes prior to terminate?  I heard her
> acknowledge she understood in your office.

*Id.* (ellipses in original).  Ms. Richardson requested that Mr. Petasis "advise Debbie Grandval to

confront me as a professional colleague with respect" and informed him that she was leaving

work early because she did not feel well and could not "successfully function" "[d]ue to the

stress and hostile environment today."  *Id.*  Ms. Richardson made no mention of any threats of

physical violence or racial animus.

Ms. Richardson met with Mr. Petasis the next day, May 10, 2012, to discuss the incident

with Ms. Grandval, and Ms. Richardson created a "Memorandum For Record" purporting to

summarize her account of their conversation.  *See* Defs.' Ex. 13, ECF No. 40-15.  According to

this memorandum, Ms. Richardson informed Ms. Petasis that Ms. Grandval "badger[ed]" her,

repeatedly asking "why did you send the email?" and was "antagonistic and threatening me."  *Id.*

at SDR000214.  She stated that she "felt uncomfortable, harassed, and insulted."  *Id.*  She also

wrote:  "Debbie turns around and does what she feels like doing to Sharon.  Debbie can shoot

Sharon. . . .  She can hurt Sharon.  She can do whatever she wants to Sharon and there's no

recourse, no consequences."  *Id.*  She also stated that she would be locking her door after hours

and that she did not "feel safe or comfortable."  *Id.*  She also wrote that she told Mr. Petasis that

she "know[s] what to do the next time" and that when Mr. Petasis asked her what she would do,

she responded by stating, "It will be a surprise.  I know how to handle it," and "You'll see."  *Id.*

at SDR000215.  While the memorandum states that Ms. Grandval was "threatening" Ms.

Richardson during the encounter, it does not state or otherwise indicate that Ms. Grandval

explicitly threatened physical violence.  The memorandum also contains no mention of potential

racial animus.

### F.  Incident with Mr. Petasis and Ms. Grandval and Medical Leave in the Summer of 2012

On June 4, 2012, according to Ms. Richardson, Mr. Petasis excluded her from a meeting

with SAIS's campus in Bologna, Italy regarding IT Operations but allowed Ms. Grandval to

attend.  *See* Richardson Aff. ¶¶ 50–52; Defs.' SOF ¶ 29.  Ms. Richardson states that, on the same

day, Mr. Petasis "yelled and screamed" at her in his office.[12]  Richardson Aff. ¶ 54.  Ms.

---

[12]     It is unclear from Ms. Richardson's affidavit whether this incident occurred before or
after the meeting with SAIS's campus in Bologna or whether there was any connection between
Ms. Richardson's exclusion from that meeting and this incident.

Richardson states that Mr. Petasis "invited Defendant Grandval to join in his interrogation of me during this meeting and she did." *Id.* ¶ 55. Ms. Richardson states that during the meeting Ms. Grandval "lodged a complaint regarding my alleged use of abusive language towards her" but that neither Mr. Petasis nor Ms. Grandval told her what she was accused of saying, though they stated that they would take Ms. Grandval's complaint to Human Resources. *See id.* ¶¶ 57–59. Ms. Richardson states that, following this meeting, she "felt like [she] was having a heart attack," fell to the floor, temporarily lost consciousness, and asked one of her staff members to call 911. *Id.* ¶ 62. She was taken to a hospital in an ambulance where she underwent medical tests. *See id.*

Documents indicate that Ms. Richardson was out of the office for at least a short period following the incident on June 4, 2012.[13] *See* Defs.' Ex. 29-A at JHU00189–90, ECF No. 41-5. While she was out of the office, Mr. Petasis asked one of Ms. Richardson's staff members to remove her from an e-mail distribution list and put her back on the list upon her return to the office. *See id.* Ms. Richardson states that this removal would have "disengage[d] [her] access to the staff, service desk activity, staff communication, and etc." Richardson Aff. ¶ 154. When Ms. Richardson requested to be put back on the list, Mr. Petasis responded that he would "rather you stay off work while you're on sick leave" and said that she would be added upon her return. Defs.' Ex. 29-A at JHU00189. After Ms. Richardson reiterated her request to be added back to the list immediately, Mr. Petasis agreed to do so. *See id.* Ms. Richardson states that she raised this issue to Ms. Hines, who told her that "George is just being petty." Richardson Aff. ¶ 154.

According to Ms. Hines, on or about June 22, 2012, Mr. Petasis asked her for advice "on how to discipline Richardson given the ongoing work performance and insubordination

---

[13]     This period may have been only one day. *See* Defs.' SOF ¶ 30.

problems," and, on June 26, 2012, Ms. Hines advised Mr. Petasis to prepare a Final Written Warning.[14]   Hines Aff. ¶ 5.   Ms. Richardson began receiving mental health treatment and, on her physician's recommendation, took Family Medical Leave from her employment from July 9, 2012 to August 13, 2012.   *See* Richardson Aff. ¶¶ 63–65.   Upon her return to work on August 13, she filed her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), as well as a complaint with JHU's Office of Institutional Equity at or around the same time.   *See* Defs.' SOF ¶ 67; Richardson Aff. ¶ 66.   Documents indicate that Ms. Richardson informed at least Ms. Hines of her filing upon her return to work.   *See* Pl.'s Ex. 9 at JHU00514, ECF No. 42-12 ("Ms. Hines said that when Ms. Richardson was on medical leave she filed her first EEOC complaint and that she notified Ms. Hines she had filed the EEOC complaint upon her return to work.").

### G.  Alleged Removal of Supervisory Duties, Final Written Warning, and Alleged Reassignment in September 2012

Documents reflect that Ms. Richardson's relationship with Mr. Petasis and Ms. Grandval continued to deteriorate following her return from medical leave and her filing with the EEOC. For example, on the day she returned, Ms. Richardson wrote to Mr. Petasis and Ms. Grandval regarding a binder that she said was in her office prior to her medical leave but could not find upon her return:  "My 'shredding' information is missing!!!!  That would have been helpful in writing procedures….Oh well….It walked away!!!!!!"  Defs.' Ex. 27 at JHU00385 (ellipses in original).  Mr. Petasis responded by writing to Ms. Richardson that "insinuating that one of your colleagues has walked away with your binder without any kind of proof is both unacceptable and

---

[14]      As discussed, *infra*, JHU did not issue Ms. Richardson a Final Written Warning until September 2012.

unprofessional – please refrain from doing so in the future." *Id.* at JHU00384.  Similar e-mail

exchanges occurred over the next several weeks.  Also, according to a memorandum authored by

Ms. Richardson and addressed to Mr. Petasis, he and Ms. Grandval told Ms. Richardson on

September 4, 2012 that they would be "taking me to Human Resources."  Defs.' Ex. 29-A at

JHU00184.

On September 11, 2012, according to Ms. Richardson, Ms. Grandval announced during a

meeting with the IT Operations staff that Mr. Petasis "granted her decision making authority in

IT Operations" and that, though Ms. Richardson maintained her title as Director of Operations,

she was "demoted with no authority."  Richardson Aff. ¶¶ 67–68.  She states that, as a result of

this announcement, she was "forced to ask permission from Grandval when utilizing my staff."

*Id.* ¶ 71.  *See also* Richardson Dep. Tr. 343:7–11 ("[S]he held a meeting with my staff and

myself and indicated that she would be making decisions on behalf of the director of IT

operations.").  Ms. Richardson also testified that, during the meeting, Ms. Grandval "removed" a

member of her staff.  Richardson Dep. Tr. at 343:12–17.  Ms. Richardson e-mailed a summary of

this meeting to herself on October 1, 2012.  *See* Defs.' Ex. 19.

On September 13, 2012, Mr. Petasis issued Ms. Richardson a formal Final Written

Warning regarding her "[u]nacceptable behavior."  Defs.' Ex. 27.  The Final Written Warning

stated that since Mr. Petasis's February 29, 2012 memorandum and their meeting with Human

Resources on that day, Ms. Richardson's behavior had "deteriorated to the point that formal

action is once again required."  *Id.* at JHU00374.  The memorandum then provided Mr. Petasis's

descriptions of a variety of specific incidents and behavior that he believed were unacceptable

and unprofessional, including:  (1) raising her voice in the office or in meetings; (2) glaring at

others in an intimidating or threatening manner; (3) walking out of meetings that had not

officially ended; (4) sending harshly worded and unprofessional e-mails to Mr. Petasis and

others; (6) making unfounded accusations that others had taken things from her office; (7)

refusing to meet to discuss IT Operations matters; and (8) publicly undermining Mr. Petasis and

questioning his decisions. *See id.* at JHU00374–75.  Mr. Petasis also attached documentation to

support his statements. *See id.* at JHU00378–405.  He provided Ms. Richardson with a list of

eight actions or performance improvements that were required and informed her that her

"continued employment in the position of Director of IT Operations (classified title is IT

Manager) is in jeopardy" and that "[f]ailure to correct immediately and sustain an acceptable

level of work performance and appropriate, professional and courteous behavior to all clients

(internal and external to SAIS), including your manager and colleagues, will lead to your

termination." *Id.* at JHU00375–76.

Around this time, though it is unclear whether it occurred before, after, or at the same

time as the Final Written Warning, Mr. Petasis also assigned Ms. Richardson to work at the

Service Desk.  Ms. Richardson claims that she was "permanently reassigned" to work there,

which effectively constituted a demotion. *See* Richardson Aff. ¶ 80 (alleging that Mr. Petasis

"permanently placed my [sic] at the help desk"); *id.* ¶ 161 ("I was working at the help desk as

directed by Mr. Petasis and Ms. Grandval, not as a supervisor, but, a help desk associate, because

I was demoted to the help desk.").  She further claims that she was forced to work at the Service

Desk "alone or with minimal assistance," stating that Mr. Petasis removed assisting staff

members from the Service Desk, and she provides dates and times that she worked at the Service

Desk for long periods. *See id.* ¶ 81.  She also states that the Service Desk was located in another

building and "interfered with [her] ability to manage Operations" and "impacted [her] job" in

several specific ways. *See id.* ¶¶ 82–106.  Defendants, however, claim that Ms. Richardson was

not assigned to work at the Service Desk full-time and that working at the Service Desk fell within the scope of her duties as the Director of Operations.

### H.  Appeal to Mr. Kunka and Second EEOC Filing in October 2012

On October 9, 2012, Ms. Richardson appealed the Final Written Warning in accordance with JHU's internal procedures to Mr. Kunka.  *See* Defs.' Ex. 29.  In her appeal letter to Mr. Kunka, Ms. Richardson asserted that "Management knew" that her supervisor "habitually shouted at employees" and "habitually intimidated, abused and discriminated against employees."  *Id.* at JHU00155.  *See also* Defs.' SOF ¶ 72.  Ms. Richardson also responded to the various incidents described by Mr. Petasis in the Final Written Warning one-by-one, and, by her own admission in response to Defendants' motion for summary judgment, the only allegations she specifically denied were that she refused to meet with Mr. Petasis and that she walked out of a meeting before it had ended.[15]  *See* Defs.' Ex. 29 at JHU00156–60; Defs.' SOF ¶ 72; Pl.'s Stmt. Facts In Dispute ¶ 72, ECF No. 42-2.  In the remainder of her letter, Ms. Richardson attempted to justify her conduct and accused Mr. Petasis of engaging in equally unprofessional conduct with her.  *See* Defs.' Ex. 29 at JHU00157–58; Defs.' SOF ¶ 72; Pl.'s Stmt. Facts In Dispute ¶ 72.  On October 24, 2012, Mr. Kunka upheld the Final Written Warning and explained his reasons in a 23-page letter, providing excerpts from e-mail exchanges in support.  *See* Defs.' Ex. 30, ECF No. 40-31.

On October 17, 2012, before Mr. Kunka's decision to uphold the Final Written Warning, Ms. Richardson filed a retaliation charge with the EEOC.  *See* Richardson Aff. ¶ 110.

---

[15]     Ms. Richardson explains this by stating that she "declined to revisit all of the allegations pertaining to my EEOC Filings because I knew that I was not going to receive fair results." Richardson Aff. ¶ 76.

## I. Roger Daniel, Paid Administrative Leave, and Resignation

From December 2012 to February 2013, an African-American man named Roger Daniel worked in SAIS's Office of Information Technology and reported to Ms. Richardson. *See* Aff. Roger Daniel ¶¶ 1, 2, 8 ("Daniel Aff."), Pl.'s Ex. 8, ECF No. 42-11. Ms. Richardson, among others, interviewed Mr. Daniel for his position, and Mr. Petasis, in part based on her recommendation, as well as his own interview and others' recommendations, hired him. *See* Richardson Aff. ¶¶ 114–15. In her affidavit submitted in opposition to Defendants' motion for summary judgment, Ms. Richardson claims that Mr. Petasis continued to refer to staff members as "boy," specifically citing the example of Mr. Daniel. She states that "[o]n several occasions Mr. Roger Daniel who is African-American complained to me regarding Defendant Petasis referring to him as a 'boy.'"[16] Richardson Aff. ¶ 15. She also provides an affidavit from Mr.

---

[16] Defendants argue that the Court should not consider this portion of Ms. Richardson's affidavit, because it is a "sham affidavit." Defs.' Reply Supp. Mot. Summ. J. at 5–7, ECF No. 46. The "sham affidavit rule" "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (internal quotation omitted). "If the supplemental affidavit does not contradict but instead clarifies the prior sworn statement, then it is usually considered admissible." *Id.* Defendants cite Ms. Richardson's statement during her deposition that she "cannot say" whether any African-American employees complained to her about being referred to as boys as the support for their argument. *See* Defs.' Reply at 5–7 (quoting Richardson Dep. Tr. at 276:16–22). But a full reading of Ms. Richardson's answer shows that her affidavit is not contradictory. During the deposition, she responded: "I don't know. I don't – I cannot say emphatically yes or no Bazemore, Robert Bazemore. I do believe there was a discussion that – I'm not – I cannot say." Richardson Dep. Tr. at 276:19–22. Ms. Richardson did not state that no African-American employees complained to her; she simply stated that she was not certain in her recollection and, in fact, gave some indication that an African-American employee had complained to her. While her failure to recall Mr. Daniel's complaints during the deposition may be relevant to her credibility as a witness (which is not before the Court on summary judgment), it is not a basis for excluding her more recent recollection. Even if the Court were to exclude this portion of the affidavit, it would have no material impact on its analysis, as the Court finds that this evidence is insufficient to create an inference of discrimination.

Daniel confirming her account.[17]  *See generally* Daniel Aff.  He states that he complained to Ms. Richardson that Mr. Petasis referred to him as a "boy" and that, as an African-American, he "found that to be racist and very offensive."  *Id.* ¶¶ 10–11.  He also states that he "never heard Mr. Petasis refer to any Caucasians as 'boy.'"  *Id.* ¶ 12.  Mr. Daniel also states that Mr. Petasis "struck" him on "several occasions," including one in which he "nearly lost [his] balance."  *Id.* at ¶¶ 5–6.  He states that Ms. Richardson witnessed this incident and that he reported other incidents to her.  *See id.* ¶¶ 7, 9.  Ms. Richardson states that on December 18, 2012, she spoke with Mr. Petasis about hitting Mr. Daniel.  *See* Richardson Aff. ¶ 124.

On December 21, 2012, JHU placed Ms. Richardson on "paid administrative leave" (which can also be appropriately referred to as a suspension) through January 29, 2013 with full salary and benefits.[18]  Defs.' SOF ¶ 78; Defs.' Ex. 32, ECF No. 40-33.  Ms. Hines informed Ms.

---

[17]     Defendants also argue that the Court should not consider Mr. Daniel's affidavit under the sham affidavit rule based upon Mr. Daniel's prior deposition testimony in this case.  *See* Defs.' Reply Supp. Mot. Summ. J. at 7.  In this Circuit, there appears to be an open question as to whether the sham affidavit rule applies to statements by non-parties.  *See, e.g., Solomon v. Vilsack*, 628 F.3d 555, 566 (D.C. Cir. 2010) (assuming without deciding that the rule applies to non-parties); *Galvin*, 488 F.3d at 1030–31 (refraining from deciding whether the sham affidavit rule should apply to a non-party witness).  The Court need not answer that question here, because, even assuming that the rule did apply, Mr. Daniel's affidavit would not be excluded.  First, Defendants do not provide the Court with any citation to Mr. Daniel's deposition testimony, leaving the Court unable to properly consider the issue.  It is not even clear to the Court if Mr. Daniel was asked whether Mr. Petasis ever referred to him as a boy during his deposition.  Moreover, even assuming the accuracy of Defendants' characterization of the testimony, Mr. Daniel does not appear to have contradicted his testimony in his affidavit.  Rather, at worst, Mr. Daniel now recalls something that he did not mention or recall during his deposition.  While that may be relevant to his credibility as a witness, it is not a contradiction requiring exclusion from consideration.  Even if the Court were to exclude the affidavit, it would have no material impact on its analysis, as the Court finds that this evidence is insufficient to create an inference of discrimination.

[18]     The Court observes that the letter to Ms. Richardson setting forth the terms of the suspension stated that the administrative leave would run through January 22, 2013.  *See* Defs.' Ex. 32 at JHU00581.  The parties, however, are in agreement that her administrative leave was to run through January 29, 2013.  *See* Defs.' SOF ¶ 78; Pl.'s Stmt. Facts ¶ 78.  The Court accepts

Richardson of the disciplinary action by letter dated the same day.  *See* Defs.' Ex. 32.  In the letter, Ms. Hines referenced her meeting with Ms. Richardson and Ms. Petasis in February 2012 and the Final Written Warning in September 2012.  *See id.* at JHU00581.  The letter stated that, since the Final Written Warning, there had been "no resolution to the performance concerns identified" and that Ms. Richardson had "failed to meet, fully, partially and/or consistently, corrective actions and performance improvements as outline [sic] in the Final Written Warning." *Id.*

The letter stated that "[a]s a condition" of Ms. Richardson's return, she was required to complete two tasks for Mr. Petasis:  first, an assignment that Mr. Petasis had given her previously but found to be insufficiently completed; and second, a memorandum explaining how she would meet the expectations described in the Final Written Warning, along with a "plan for fulfilling" all of her listed job duties.  *See id.* at JHU00582.  The letter stated that these tasks were "part of your return to work and without them you will not have met the criteria to return to work" and that "[f]ailure by you to meet expectations will result in termination." *Id.*  The letter also stated, however, that during her administrative leave, Ms. Richardson "should not report to work, nor perform any managerial, supervisory or operational work duties." *Id.*  It also stated that she should set up an auto reply message on her e-mail account indicating that she was on leave and directing individuals to contact Mr. Petasis or her designee regarding work-related matters.  *See id.*  Finally, the letter stated that Ms. Richardson would "need to obtain permission to be on the JHU/SAIS campus unless you have prearranged meetings with the SAIS or

---

the parties' agreed-upon facts.  As discussed, *infra*, whether the administrative leave was to run through January 22 or January 29 is immaterial for purposes of summary judgment.

Homewood Human Resources Office, JHU Faculty and Staff Assistance Program and/or medical appointments." *Id.*

Ms. Richardson did not complete either of the tasks required as a condition for her return. *See* Defs.' SOF ¶ 78; Pl.'s Stmt. Facts ¶ 78.  Ms. Richardson states that she attempted to complete the first task but could not do so because, without access to certain SAIS systems, she was unable to obtain necessary data and other information.  *See* Richardson Aff. ¶¶ 139–40. According to Ms. Richardson, she asked Mr. Elahi about her lack of access, and he responded that "the staff was directed not to help you." *Id.* ¶ 139.  She states that she then contacted another staff member, Pedro Matias, and asked him to run and e-mail her a report that she needed to complete the assignment since she did not have access, and Mr. Matias told her that "George told us not to help you" and "you know what George would do if he found out."[19]  *Id.*

On January 22, 2013, Ms. Richardson submitted a letter of resignation.  *See* Hines Aff. Ex. E, ECF No. 40-5.  In her letter, Ms. Richardson stated that her "complaints of race and sexual discrimination have fallen on deaf ears" and that she could "no longer tolerate the working conditions under discrimination, harassment and retaliation I reported several times previously." *Id.* at JHU00326.  She also wrote that her lack of "access to the necessary system and inability to communicate with staff that have been directed 'not to help or communicate with Sharon' is a 'NO WIN' situation." *Id.*  She stated that JHU had therefore forced her to resign. *See id.*

---

[19]     Defendants argue that Mr. Matias's purported statement is inadmissible hearsay that the Court cannot consider.  The Court disagrees.  Mr. Matias's statement, as well as the statement by Mr. Elahi, plainly fall within Federal Rule of Evidence 801's definition of an opposing party's statements that are not hearsay.  *See* Fed. R. Evid. 801(d)(2)(D) (providing that statements offered against an opposing party that were "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay).

### J. Final Internal Appeal and the Present Action

Ms. Richardson also appealed Mr. Kunka's decision to uphold the Final Written Warning in accordance with JHU's internal procedures and denied additional factual allegations.  *See* Defs.' SOF ¶ 77.  On March 8, 2013, after Ms. Richardson had resigned, JHU's Vice President for Human Resources accepted the recommendation of JHU's Appeal Panel and amended the Final Written Warning to delete the reference to it being a "Final" Written Warning.  *See* Defs.' Ex. 31, ECF No. 40-32.  The Appeal Panel found that Mr. Petasis's February 2012 memorandum made "no reference to it being a discipline" and that, therefore, the Final Written Warning was "the first discipline she received."  *Id.* at SDR001058.  As a result, the Appeal Panel stated that the written warning "should not have been elevated to a final warning."  *Id.*  The Appeal Panel also found, however, that based upon its review of the documents provided in the Final Written Warning, Ms. Richardson "failed to meet expectations stated in the February 29, 2012, memorandum" and was "accountable for her communication."  *Id.*

On June 3, 2013, Ms. Richardson commenced the present action.

### III. ANALYSIS

Defendants argue that they are entitled to summary judgment on all counts of the Amended Complaint.  *See* Mem. Supp. Defs.' Mot. Summ. J. at 1, ECF No. 40-1.  The Court begins its analysis by setting forth the legal standard for resolving motions for summary judgment.  The Court then addresses whether JHU is entitled to summary judgment on Ms. Richardson's various claims of discrimination and retaliation before turning to Ms. Richardson's claims against each of the Individual Defendants for aiding and abetting the alleged discrimination and retaliation.

### A.  Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See id.* at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See id.* at 324.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. Discrete Discriminatory Actions

Ms. Richardson brings claims against JHU for discrete racially discriminatory employment actions on the basis of disparate treatment through Counts I, II, and III of her Amended Complaint.[20]   *See* Am. Compl. ¶¶ 121–32.  Count I is brought under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  *See id.* ¶¶ 121–24.  Count II is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  *See id.* ¶¶ 125–28.  Count III is brought under the DCHRA.  *See id.* ¶¶ 129–32.  "Where, as here, the plaintiff has proffered no direct evidence of intentional discrimination, race discrimination claims under both the DCHRA and Section 1981 are evaluated using the same framework as claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2000)."  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997)).

If a Title VII plaintiff proffers only indirect evidence of discrimination at summary judgment, courts apply the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination by showing that:  "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Czekalski*, 475 F.3d at 364 (internal quotation omitted).  "The burden of establishing a prima facie case of

---

[20]   The language of Counts I, II, and III of the Amended Complaint broadly incorporates all forms of unlawful discrimination on the basis of race.  *See* Am. Compl. ¶¶ 121–32.  Ms. Richardson's claim for hostile work environment, though a form of unlawful discrimination, is brought separately under Count VI.  *See id.* ¶¶ 145–50.  The parties construe Counts I, II, and III to therefore concern tangible employment actions, and the Court does the same.  As discussed, *infra*, however, the Court also treats Ms. Richardson's claim of constructive discharge, which is not pleaded as a separate count, as falling within Counts I, II, and III.

disparate treatment is not onerous." *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (describing the requirements for establishing a prima facie case as "minimal"); *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005) ("A minimal evidentiary showing will satisfy this burden of production.").

Once the plaintiff establishes a prima facie case, then the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action; and finally, if the employer meets that burden, then the plaintiff must show that the employer's asserted reason was a pretextual cover for discrimination. *See McDonnell Douglas*, 411 U.S. at 802–05. If, however, the plaintiff has suffered an adverse employment action and her employer asserts a legitimate, non-discriminatory reason for the action, then the Court must forgo the *McDonnell Douglas* burden-shifting framework. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the Court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . .?" *Id.*

Here, Ms. Richardson claims that she suffered three separate tangible adverse employment actions:[21] (1) removal of her supervisory duties in September 2012; (2) permanent

---

[21] In her opposition to Defendants' motion for summary judgment, Ms. Richardson does not claim that the Final Written Warning in September 2012, which preceded and laid the foundation for her suspension, was a discrete discriminatory action, only that it was an unlawful act of retaliation. *See* Pl.'s Opp. at 19–22 (arguing that the three "[a]ctionable changes in Plaintiff's employment" for purposes of her discrimination claims were the removal of her supervisory duties, her reassignment to the Service Desk, and her suspension); *id.* at 25–26 (arguing that the Final Written Warning was a materially adverse employment action for purposes of her retaliation claims). In their motion for summary judgment, Defendants anticipatorily argued— presumably because the Complaint does not specify which actions are allegedly discriminatory

reassignment to the Service Desk in September 2012; and (3) her administrative suspension from December 2012 to January 2013.  *See* Pl.'s Opp. Defs.' Mot. Summ. J. at 19–22, ECF No. 42. Defendants argue that none of these events constitute an adverse employment action and that Ms. Richardson cannot show an inference of discrimination necessary to establish a prima facie case. Defendants also proffer two legitimate, non-discriminatory reasons for Ms. Richardson's administrative suspension.[22]  The Court applies the legal framework to each of these purported actions separately.

### 1.  Removal of Supervisory Duties in September 2012

Ms. Richardson claims that she suffered her first discriminatory adverse employment action when Ms. Grandval announced during a meeting with the IT Operations staff on September 11, 2012 that Mr. Petasis "granted her decision making authority in IT Operations," Richardson Aff. ¶ 67, and that, as a result, she was forced to seek Ms. Grandval's permission when utilizing her staff members.  *See* Richardson Aff. ¶¶ 67–71.  Because Defendants do not proffer any legitimate, non-discriminatory reasons for the alleged action, the Court considers only whether Ms. Richardson has made the minimal evidentiary showing to establish a prima facie case of disparate treatment discrimination.

---

and which are allegedly retaliatory—that neither the Final Written Warning nor the suspension were actionable adverse employment actions for purposes of Ms. Richardson's discrimination claims.  *See* Defs.' Mem. Supp. at 24–29.  In accordance with Ms. Richardson's presentation of her case on summary judgment, the Court does not treat the Final Written Warning as a separate alleged discriminatory action but rather as relevant to its analysis of Ms. Richardson's suspension.  The Court need not take a position on whether the Final Written Warning could have been actionable as a discriminatory adverse employment action.

[22]     Defendants do not dispute that Ms. Richardson is a member of a protected class, the first element of a prima facie case.

*a. Adverse Employment Action*

Defendants challenge Ms. Richardson's claim that her supervisory duties were removed in September 2012 as "unfounded" and argue that, even if true, it would not constitute an adverse employment action. *See* Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 16–17, ECF No. 46. The Court disagrees on both of these issues.

First, the Court finds that Defendants fail to establish the absence of a genuine dispute as to whether Ms. Grandval assumed Ms. Richardson's supervisory duties on September 11, 2012 with Mr. Petasis's authorization. Defendants argue that Ms. Richardson's factual claim is undermined by an e-mail that Mr. Petasis sent to Ms. Richardson and Ms. Grandval on the same day in which he referred to Ms. Richardson having a "management responsibility" to oversee the Service Desk. *See* Defs.' Ex. 33, ECF No. 46-2. But this e-mail does not put Ms. Richardson's claim beyond dispute. The e-mail primarily concerns Ms. Richardson's second alleged adverse action, her purported permanent reassignment to the Service Desk, and does not appear to directly concern Ms. Grandval's alleged announcement or Mr. Petasis's alleged authorization. Defendants do not provide any other evidence in their effort to disprove Ms. Richardson's factual claim. They do not, for example, provide the Court with any testimony from Mr. Petasis or Ms. Grandval on this issue. Nor do they provide testimony from any of Ms. Richardson's staff members who were allegedly present at the meeting, were the audience of the announcement, and worked with Ms. Richardson and Ms. Grandval following the alleged announcement. Defendants do, however, provide the Court with Ms. Richardson's testimony on this issue, as well as an e-mail that she sent to herself summarizing this meeting, which support her claim. *See* Richardson Dep. Tr. 343:7–20; Defs.' Ex. 19. Viewing the evidence in the light most favorable to Ms. Richardson, the Court concludes that a reasonable juror could find that

Ms. Grandval assumed Ms. Richardson's supervisory duties in September 2012 with the authorization of Mr. Petasis.

The Court next considers whether, if true, Ms. Grandval's assumption of Ms. Richardson's supervisory duties with Mr. Petasis's authorization would constitute an adverse employment action, the second prong of the prima facie analysis.  "An 'adverse employment action' is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor*, 350 F.3d at 1293)).  The employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  The D.C. Circuit has stated that, among other things, "withdrawing an employee's supervisory duties constitutes an adverse employment action."  *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) (citing *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002)).

Defendants argue that Ms. Grandval's announcement cannot serve as an adverse employment action because Ms. Grandval was Ms. Richardson's co-worker and "did not have supervisory authority over or the authority to hire, fire, promote or demote Richardson."  Defs.' Reply at 16.  Defendants misconstrue Ms. Richardson's claim.  Ms. Richardson alleges that Mr. Petasis, who indisputably had supervisory authority over Ms. Richardson, authorized Ms. Grandval's assumption of her supervisory duties.  *See* Richardson Aff. ¶¶ 67–71; *id.* ¶ 161; Am. Compl. ¶¶ 82–84; Defs.' SOF ¶ 45.  If Mr. Petasis authorized Ms. Grandval to assume Ms. Richardson's supervisory duties and make decisions on behalf of Operations, as Ms. Richardson

alleges and a reasonable juror could conclude on the record before the Court, then that would constitute an adverse employment action.

### b. Inference of Discrimination

Turning to the final prong of the prima facie analysis, the Court considers whether Ms. Richardson has established that the alleged removal of her supervisory duties gives rise to an inference of discrimination.  In her opposition to Defendants' motion for summary judgment, Ms. Richardson offers a myriad of evidence in an effort to satisfy this burden.  The Court finds that, although most of this evidence is ineffective, Ms. Richardson presents evidence sufficient to create an inference of discrimination.

Ms. Richardson opens the "Statement of Facts" section of her opposition with the following statement:  "Defendant George Petasis does not like strong Black women."  Pl.'s Opp. at 3 (citing Pl.'s Ex. 6, ECF No. 42-9).  Her sole citation for this dramatic statement is what appears to be an incomplete and undated photocopied printout of an unidentified website (with the URL partially obscured) containing an anonymous post providing an opinion regarding employment at a company called "Advanced Technology Associates."[23]  *See* Pl.'s Ex. 6.  In one of the reviews, the anonymous author writes, regarding a person named George Petasis:  "And George does not like women, particularly black women – who excel or have the potential to excel beyond him."  *Id.*  As Defendants observe, the exhibit provides no identifying information for either the author of the statement or the web site itself, and Ms. Richardson does not offer any such evidence.  *See id.*  Ms. Richardson does not even provide any evidence demonstrating that

---

[23]     The declaration of Ms. Richardson's counsel attaching this exhibit describes this document as "a web critique of Architect of the Capital [sic]."  Decl. John Christopher Luke, Jr. ¶ 7, ECF No. 42-1.  This description appears plainly incorrect from the face of the document. Mr. Luke does not provide any further description of or explanation for this document.

the person referenced in the review is the same George Petasis that is a defendant in this action.[24] As Ms. Richardson clearly attempts to use the anonymous post for the truth of the matter asserted, it is, as Defendants argue, pure hearsay, and it has no value. *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation omitted)).

Ms. Richardson next points to Mr. Petasis's use of the term "boys" to refer to male staff members as "independent evidence of discriminatory statements or attitudes on the part of the employer." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998). The Supreme Court has stated that "[a]lthough it is true that the [word 'boy'] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). To show context, Ms. Richardson cites Mr. Daniel's statements that, during his very brief employment, Mr. Daniel never heard Mr. Petasis refer to any Caucasians as "boys." Daniel Aff. ¶¶ 12–13.

Ms. Richardson's own account, however, provides further context that cuts against her position. She testified that Mr. Petasis referred to an employee of Filipino origin and an employee of Iranian origin as "his boys" or asked her, "How is your boy?" Richardson Dep. Tr. at 263:14–18; *id.* at 270:14–18; *id.* at 272:8–274:18. This usage of the term is common and innocuous, and, given that Mr. Petasis appears to have used the term primarily to refer to non-

---

[24] For example, the Court is unable to locate any evidence in the Record indicating that Mr. Petasis was previously employed by Advanced Technology Associates, the Architect of the Capitol, or "SAIC" or that he required a Green Card in order to maintain a job in the United States, as the person is described in the anonymous review. *See* Pl.'s Ex. 6.

African-Americans, he does not appear to have used it with any racial connotation.[25]   Even to the

extent that this evidence could be reasonably interpreted to suggest that Mr. Petasis had some

generalized racial prejudices, it would be insufficient to establish a prima facie case, because Mr.

Petasis's alleged statements did not pertain to Ms. Richardson and were entirely disconnected

from the decision-making process concerning the alleged removal of her supervisory duties.  *See*

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (stating that

neither "stray remarks in the workplace" nor "statements by decisionmakers unrelated to the

decisional process itself, [can] suffice to satisfy plaintiff's burden"); *Straughn v. Delta Air Lines,*

*Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) (stating that the "probativeness" of discriminatory stray

---

[25]      In her opposition, Ms. Richardson states that she "will spare [the Court] a dissertation on
the usage of the word 'boy' when applied to Philippine, Iranian, and Ethiopian men."  Pl.'s Opp.
at 18 n.8.  First, as discussed, *supra*, there is no indication in the record that Ms. Richardson had
raised issues concerning Mr. Petasis's use of the term with respect to three staff members, in
addition to Mr. Daniel.  The record indicates that she discussed only two.  In her memorandum,
she wrote that one staff member was of "[Philippians [sic] Origin] and another is [Ethiopian
Nationality]."  Defs.' Ex. 8 at SDR000992.  During her deposition, she testified that the second
staff member was Mr. Elahi, who she said was of Iranian origin.  *See* Richardson Dep. Tr. at
263:13–18; *id.* at 270:11–16.  Second, while the Court does not need a "dissertation," the
Supreme Court stated in *Ash* that the significance of the term "boy" in a discrimination case
depends on context, including local custom and historical usage.  *See Ash*, 546 U.S. at 456.
Without context regarding usage of the term towards men of Philippine and Iranian national
origin, Ms. Richardson has great difficulty showing any inference of racial animus.  It is also
notable that Ms. Richardson testified that neither Mr. Berbano nor Mr. Elahi told her that they
found the term "boy" to be derogatory because of a connotation to slavery and that Ms.
Richardson said that she "interjected that word."  Richardson Dep. Tr. at 271:18–272:1.  Indeed,
while the terms "boy" and "boys" have historically been used in a racially derogatory manner,
the terms have also long been used informally, even if offensively, without any negative racial
connotation.  *See* "*boy*," Dictionary.com Unabridged, http://dictionary.reference.com/browse/boy
(last visited November 25, 2015) (providing alternate informal definition as "a grown man,
especially when referred to familiarly"); *see, e.g., Seinfeld:  The Marine Biologist* (NBC
television broadcast Feb. 10, 1994) ("So I started to walk into the water.  I won't lie to you boys.
I was terrified!"); Bob Dylan, *Bob Dylan's 115th Dream*, *on* Bringing It All Back Home
(Columbia Records 1965) ("Boys, forget the whale / Look on over yonder / Cut the engines /
Change the sail"); Ella Fitzgerald & Louis Armstrong, *They Can't Take That Away From Me*, *on*
Ella and Louis (Verve Records 1956) ("Swing it, boys"); Muddy Waters, *Louisiana Blues* (Chess
Records 1950) ("Let's go back to New Orleans boys").

remarks "is circumscribed if they were made in a situation temporally remote from the date of the employment decision or . . . were not related to the employment decision in question" (internal quotation omitted) (ellipses in original)); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding in an age-discrimination case that a decision-maker's statement to plaintiff that "[we] don't necessarily like grey hair," unconnected to plaintiff's termination, was a stray remark insufficient to defeat summary judgment for the employer).

Ms. Richardson similarly points to Mr. Petasis's alleged battery of Mr. Daniel as independent evidence of a discriminatory attitude. Specifically, Mr. Daniel states that he never witnessed Mr. Petasis strike any Caucasians "with the same force or frequency" that he struck him.[26] Daniel Aff. ¶ 13. There is no other evidence to suggest that Mr. Petasis's alleged battery of Mr. Daniel was motivated by racial discrimination, as, for example, neither Mr. Daniel nor Ms. Richardson provide evidence indicating a connection between Mr. Petasis's use of the term "boy" and his alleged battery of Mr. Daniel. Moreover, as with Mr. Petasis's use of the term "boy," even to the extent that his alleged battery of Mr. Daniel could be probative of whether he harbored general racial prejudices, it is insufficient to establish Ms. Richardson's prima facie case, because the alleged battery bears no connection to the decision-making process concerning the alleged removal of Ms. Richardson's supervisory duties, or any other relevant decision made with respect to Ms. Richardson.

---

[26]     Mr. Daniel states that he was employed in the IT Department of SAIS for less than two months. *See* Daniel Aff. ¶ 1. Given his highly limited context, the probative value of his observation is questionable. The value of this observation is further undercut by Ms. Richardson's own report that other non-African-American staff members complained about Mr. Petasis inappropriately grabbing their shoulders and shaking them and that when Mr. Petasis walked into a room "[t]hey jump and respond like frightened children, becoming very nervous." Defs.' Ex. 8 at SDR000993.

Ms. Richardson's evidence of Mr. Petasis's disparate treatment of Ms. Grandval, who is outside Ms. Richardson's protected class, is much more effective at creating an inference of discrimination. *See* Pl.'s Opp. at 13. "A plaintiff can establish an inference of discrimination 'by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class.'" *Augustus v. Locke*, 934 F. Supp. 2d 220, 232 (D.D.C. 2013) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). "'[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Ms. Richardson's attempt in her opposition brief to establish that she and Ms. Grandval were similarly situated employees is admittedly limited: "Plaintiff and Defendant Grandval both were supervised by Defendant Petasis.  Since hired around the same time [sic] they both served under the same standards.  They were on the same level." Pl.'s Opp. at 12.  Her only citation to the record is to an exhibit containing excerpted portions of Ms. Hines's deposition testimony. *See id.* (citing Pl.'s Ex. 5, ECF No. 42-8).  Nothing in the excerpted portions of Ms. Hines's testimony, however, indicates that Ms. Richardson and Ms. Hines were similarly situated employees.  *See* Pl.'s Ex. 5.  Despite Ms. Richardson's weak effort to demonstrate that she and Ms. Grandval were similarly situated, however, Defendants, for their part, wholly fail to address the argument.  The Court therefore finds that, analyzing all underlying facts and inferences in the light most favorable to Ms. Richardson, Ms. Richardson and Ms. Grandval were similarly

situated employees.  This finding is supported by the record before the Court, notwithstanding Ms. Richardson's failure to cite it.[27]  For example, it is undisputed that she and Ms. Grandval both reported to Mr. Petasis during the relevant time period, and documentary evidence indicates that the two were considered to be on the same level in terms of the hierarchy for SAIS's Office of Information Technology.  *See, e.g.,* Pl.'s Ex. 14, ECF No. 42-17 (organizational chart for SAIS's Office of Information Technology showing Ms. Richardson and Ms. Grandval on a parallel level below Mr. Petasis).

It is also clear from the record—and Defendants do not argue otherwise—that Mr. Petasis treated Ms. Grandval more favorably than he treated Ms. Richardson.  As discussed, *supra*, a reasonable juror could find, based on the record before the Court, that Mr. Petasis authorized Ms. Grandval to assume Ms. Richardson's supervisory duties.  Many of Ms. Richardson's other allegations of disparate treatment are unchallenged and unexplained.  For example, Ms. Richardson alleges that, a few months before shifting her supervisory duties to Ms. Grandval, Mr. Petasis removed her access to the shared Microsoft Outlook calendar while maintaining Ms. Grandval's access.  *See* Richardson Aff. ¶ 153.  Similarly, she alleges that Mr. Petasis frequently excluded her from meetings that were important to her job function but included Ms. Grandval. *See, e.g.,* Richardson Aff. ¶¶ 45–52; Defs.' SOF ¶ 29.  Ms. Richardson also alleges that when she brought complaints about Ms. Grandval's conduct to Mr. Petasis, he did not take action but that

---

[27]     The Court acknowledges that other portions of the record, not cited by Defendants with respect to this issue, might suggest that Ms. Richardson and Ms. Grandval were not nearly identical.  For example, it is undisputed that Mr. Petasis did not hire Ms. Grandval for Ms. Richardson's Director of Operations position due to her qualifications but that he subsequently hired her for a different position.  *See* Defs.' SOF ¶¶ 7–9; *id.* ¶ 33.  This might suggest that the two occupied different positions with different qualifications and responsibilities.  Given Defendants' decision to not rely upon this evidence or otherwise challenge Ms. Richardson's argument that she and Ms. Grandval were similarly situated, this evidence does not alter the Court's conclusion here.

when Ms. Grandval brought him complaints about her, he did take action.  *See* Richardson Aff. ¶¶ 37–40; *id.* ¶¶ 57–59.

Ordinarily, this type of uncontroverted evidence would unquestionably give rise to an inference of discrimination.  In this case, the inquiry is somewhat muddied by the undisputed fact that Mr. Petasis originally selected Ms. Richardson over Ms. Grandval for her position, which potentially implicates the so-called "same actor inference."  In an employment discrimination case in which a plaintiff challenges her termination and "'the person who made the decision to fire [the plaintiff] was the same person who made the decision to hire'"—a type of case not too dissimilar from Ms. Richardson's claims in this case—the D.C. Circuit has recognized that "'it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire,' especially 'when the firing has occurred only a short time after the hiring.'"  *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (alteration in original)).

For several reasons, however, the Court is unable to find that JHU is entitled to summary judgment on the basis of the same actor inference.  First and foremost, Defendants do not even reference the same actor inference in their motion for summary judgment, let alone rely upon it.  Second, courts have recognized that the same actor inference is "just that, an inference, which cannot immunize the defendant from liability for subsequent discrimination."  *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 23 (D.D.C. 2009) (internal quotation omitted).  It does not alone suffice for summary judgment, and it is simply "probative evidence" against a finding of discrimination.  *See Vatel*, 627 F.3d at 1247.  Third, as the D.C. Circuit stated in *Vatel*, the inference is particularly appropriate to apply when the alleged discriminatory action occurred

"only a short time after the hiring." *Id.* (internal quotation omitted).  Here, by contrast, over a year passed between the time that Mr. Petasis hired Ms. Richardson and the time that he allegedly removed her supervisory duties.  Finally, courts that have employed the inference have generally done so at the pretext stage of the *McDonnell Douglas* analysis following proffered legitimate, non-discriminatory reasons for the conduct at issue.  *See, e.g., Vatel*, 627 F.3d at 1246–49; *Waterhouse*, 298 F.3d at 993–97.  Here, Defendants have not proffered a legitimate, non-discriminatory reason for the alleged removal of Ms. Richardson's supervisory duties (or any other alleged instance of Mr. Petasis treating Ms. Grandval more favorably than Ms. Richardson) and Ms. Richardson therefore only needs to make a minimal showing to create an inference of discrimination.

The Court's role at summary judgment is not to weigh evidence or make credibility determinations.  *See Czekalski*, 475 F.3d at 363.  Instead, the Court must analyze all underlying facts and inferences in the light most favorable to Ms. Richardson.  *See Anderson*, 477 U.S. at 255.  While the evidence may ultimately show that race played no factor in Mr. Petasis's alleged decision to permit Ms. Grandval to assume Ms. Richardson's supervisory duties, the evidence presented regarding the disparate treatment of Ms. Grandval is sufficient to meet the minimum threshold to establish an inference of discrimination at the prima facie stage, particularly in light of Defendants' failure to address that argument.  Accordingly, JHU is not entitled to summary judgment on this aspect of Ms. Richardson's discrimination claims.

### 2.  Permanent Reassignment to the Service Desk in September 2012

Ms. Richardson alleges that she suffered her second discriminatory adverse employment action when Mr. Petasis permanently reassigned or demoted her to the Service Desk in September 2012.  *See* Pl.'s Opp. at 20–21; Richardson Aff. ¶ 80 (alleging that Mr. Petasis

"permanently placed my [sic] at the help desk"); *id.* ¶ 161 ("I was working at the help desk as directed by Mr. Petasis and Ms. Grandval, not as a supervisor, but, a help desk associate, because I was demoted to the help desk."). Ms. Richardson does not claim that she suffered any reduction in pay or diminution in benefits as a result of this reassignment. Because Defendants do not proffer any legitimate, non-discriminatory reasons for the alleged action, the Court considers only whether Ms. Richardson has made the minimal evidentiary showing to establish a prima facie case of disparate treatment discrimination.

### a. Adverse Employment Action

Defendants challenge Ms. Richardson's factual claim that she was permanently reassigned to the Service Desk in September 2012 and argue that she cannot show that she suffered an adverse employment action.

First, the Court finds that Defendants fail to establish the absence of a genuine dispute as to whether Ms. Richardson was reassigned or demoted when she was assigned to work at the Service Desk. Defendants argue that Mr. Petasis neither reassigned nor demoted Ms. Richardson because she was not assigned to work at the Service Desk full-time and work at the Service Desk fell within the scope of her duties as the Director of Operations. In making this argument, Defendants rely solely upon one e-mail exchange between Mr. Petasis, Ms. Richardson, and Ms. Grandval. *See* Defs.' Ex. 33. On September 11, 2012, Mr. Petasis wrote to Ms. Richardson and Ms. Grandval:

> I've asked that Sharon handles [sic] the assignment of all unassigned tickets when she gets to work in the morning and whenever Pedro is not around. This allows Sharon a better insight as to what's going at the Service Desk and ticket loads in general – besides the fact that ticket assignment/oversight is a management responsibility.

Defs.' Ex. 33 (emphasis added).  When Ms. Richardson responded by suggesting that Mr. Petasis assign someone else, he responded, in part, that "our SD manual calls for supervisory oversight of that function and until we change it we should be following it."  *Id.*

While this exchange is probative of whether Ms. Richardson's assignment to the Service Desk fell within her normal job responsibilities and whether that assignment could be considered a demotion, it is insufficient to put the issue beyond dispute.  As a preliminary matter, Defendants do not make clear whether this e-mail exchange occurred before or after Ms. Richardson's alleged reassignment.  If it was sent before, then it is of limited, if any, value. Moreover, Defendants offer no evidence to counter the variety of other factual allegations that Ms. Richardson makes concerning her reassignment.  For example, they do not challenge her claim, for which she provides specific dates and times, that she was forced to work at the Service Desk for full days and long periods "alone or with minimal assistance" and that Mr. Petasis removed staff members that would normally assist her.  *See* Richardson Aff. ¶ 81.  Nor do they challenge her claim that her work at the Service Desk was located in another building and "impacted [her] job" in several specific ways.  *See id.* ¶¶ 82–106.  Given this failure to address key factual allegations, the Court finds that a genuine dispute exists as to whether Ms. Richardson was permanently reassigned to the Service Desk in September 2012.

Whether the reassignment, assuming that it occurred, constitutes an adverse employment action, turns on the resolution of those factual allegations.  The Supreme Court stated in *Burlington Industries v. Ellerth* that a "reassignment with significantly different responsibilities" generally constitutes an adverse employment action.  524 U.S. 742, 761 (1998).  "A drastic reduction in responsibilities is an 'objectively tangible harm' even where a plaintiff does not suffer a reduction in grade, pay, or benefits."  *Thomas v. Vilsack*, 718 F. Supp. 2d 106, 122

(D.D.C. 2010) (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)).  By contrast, "[p]urely subjective injuries, such as dissatisfaction with a reassignment," do not constitute adverse employment actions.  *Forkkio*, 306 F.3d at 1130–31.  "Mere idiosyncrasies are not sufficient to state an injury."  *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (quoting *Brown v. Brady*, 199 F.3d 446, 457 (D.C. Cir. 1999)).  Given the open factual questions, the Court is unable to determine whether the assignment to the Service Desk left Ms. Richardson with "significantly different responsibilities" or whether it was simply a staffing decision that she did not like, which does not constitute an adverse employment action for purposes of a discrimination claim.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1197 (D.C. Cir. 2008) ("[W]e have previously underscored our hesitancy to engage in judicial micromanagement of business practices by second-guessing employers' decisions about which of several qualified employees will work on a particular assignment." (internal quotation omitted)).

### b.  Inference of Discrimination

JHU, therefore, is only entitled to summary judgment with respect to the alleged reassignment if Ms. Richardson cannot meet the minimal threshold for establishing an inference of discrimination.

The evidence that Ms. Richardson offers in support of the inference of discrimination is largely the same that she offers with respect to the alleged removal of her supervisory duties.  As discussed, *supra*, the Court has found the evidence of Mr. Petasis's disparate treatment of Ms. Grandval to be sufficient to create an inference of discrimination with respect to the removal of Ms. Richardson's supervisory duties.  While that evidence does not directly concern his alleged decision to reassign Ms. Richardson to the Service Desk with diminished responsibilities, the Court finds that it is also sufficient to raise an inference of discrimination here.  Although Ms.

Richardson claims that the reassignment constituted a separate discriminatory action, the Court finds it difficult, on the record before it on summary judgment, to separate evidence concerning the motivation for one action from the motivation for the other.  The record is clear that Mr. Petasis made both decisions, and he appears to have made these decisions within the same mid-September time period, if not simultaneously.  Without any proffered legitimate, non-discriminatory reasons for the purported reassignment, this evidence is sufficient.

Accordingly, JHU is not entitled to summary judgment on this aspect of Ms. Richardson's discrimination claims.

### 3.  Paid Administrative Leave in December 2012

Ms. Richardson alleges that she suffered a third and final discriminatory adverse employment action when she was placed on paid administrative leave, which can also be considered a suspension, from December 21, 2012 to January 29, 2013.  *See* Pl.'s Opp. at 21–22. Defendants present two arguments at summary judgment.  First, they argue that Ms. Richardson's suspension did not constitute an adverse employment action as a matter of law. Second, they argue that, even assuming that it did constitute an adverse employment action, Defendants have asserted legitimate, non-discriminatory reasons for it and that Ms. Richardson cannot demonstrate those were not the actual reasons or that Defendants intentionally discriminated against Ms. Richardson on the basis of race.  *See* Defs.' Mem. Supp. at 23–25; *id.* at 28–29.  The Court addresses these issues in turn.

#### a.  Adverse Employment Action

In support of their argument that Ms. Richardson's suspension did not constitute an adverse employment action as a matter of law, Defendants cite a line of cases in this District that have held or opined in *dicta* that certain suspensions with pay did not constitute adverse

employment actions.  Defs.' Mem. Supp. at 24 (citing *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011); *Roberson v. Snow*, 404 F. Supp. 2d 79, 93 (D.D.C. 2005); *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 79 (D.D.C. 2002); *Boykin v. England*, Civ. No. 02-960 (JDB), 2003 WL 21788953, at *4 n.5 (D.D.C. July 16, 2003)).  Many of these courts appear to have reached their conclusions, at least in part, by considering the duration of the suspension.  *See, e.g., Brown*, 828 F. Supp. 2d at 9 (concluding that a suspension did not constitute an adverse employment action in part because the suspension was "brief"); *Boykin*, 2003 WL 21788953, at *4 n.5 ("[C]ase law suggests that an employee's placement on paid administrative leave for a limited period does not constitute an adverse employment action.").  As Ms. Richardson observes, her suspension of approximately 39 days,[28] was longer than many of the suspensions that were at issue in the relevant cases.  *See, e.g., Brown*, 828 F. Supp. 2d at 9 (suspension of 11 days pending an investigation); *Dickerson*, 238 F. Supp. 2d. at 78–79 (suspensions that were rescinded after less than one month).

The Court finds that Ms. Richardson's suspension constituted an adverse employment action.  The Court reaches this conclusion upon its consideration of not only the unusually long duration of the suspension but also its conditions.  Unlike a typical suspension, Ms. Richardson's continued employment was explicitly conditioned upon her completion of certain tasks that was satisfactory to Mr. Petasis, *see* Defs.' Ex. 32 at JHU00582, and, as discussed, *infra*, Ms. Richardson has presented uncontroverted evidence that Mr. Petasis prevented her from completing one of those necessary tasks.  The lengthy suspension and the unusual nature of Ms.

---

[28]     Ms. Richardson's argument states that her suspension was for 35 days.  *See* Pl.'s Opp. at 22.  This would place the intended termination of her suspension at January 25, 2013.  As discussed, *supra*, the parties are in agreement that the suspension was to run through January 29, 2013.  *See* Defs.' SOF ¶ 78; Pl.'s Stmt. Facts ¶ 78.

Richardson's continued employment sufficiently "affect[ed] the terms, conditions, or privileges of [her] employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131. The Court therefore turns to the motivations for the suspension.

### b. Defendants' Proffered Reasons and Evidence of Pretext

Defendants present two legitimate, non-discriminatory reasons for the suspension: Ms. Richardson's "insubordination" and her "unsatisfactory performance." Defs.' Mem. Supp. at 28–29. These are commonly asserted legitimate, non-discriminatory reasons for taking an adverse employment action. *See, e.g., Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (affirming that an employee's "negligence and insubordination (including discourteous treatment of her supervisor)" were legitimate, non-discriminatory reasons for discipline); *Drewrey v. Clinton*, 763 F. Supp. 2d 54, 63 (D.D.C. 2011) ("An employee's insubordination and his failure to perform his duties are legitimate, nondiscriminatory reasons for adverse employment actions."); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 95 (D.D.C. 2007) ("Insubordination and violation of company rules are widely accepted non-discriminatory reasons for termination."); *Nichols v. Billington*, 402 F. Supp. 2d 48, 73 (D.D.C. 2005) (finding that an employee's failure to attend meetings, poor job performance, refusal to complete critical projects, and "persistently uncooperative attitude, insubordination, and misconduct" were legitimate, non-discriminatory reasons to seek the employee's removal).

In support of these justifications, Defendants cite Ms. Hines's letter to Ms. Richardson informing her of her suspension. *See* Defs.' Ex. 32. The letter stated that Ms. Richardson had failed to make progress in each of the four key areas of improvement described in her Final Written Warning in September 2012, which included Ms. Richardson's failure to "follow the

instructions and directives" of her supervisor, her failure to "work effectively and efficiently without close supervision," and her failure to "engage in professional and courteous communications." *Id.* at JHU00581.  The prior Final Written Warning provided more detailed descriptions of Ms. Richardson's unprofessional behavior, attaching contemporaneous documentation as evidence.  *See* Defs.' Ex. 27.  In support of their factual claim that the quality of Ms. Richardson's work was poor, Defendants provide an affidavit from Mr. Elahi, one of Ms. Richardson's staff members, stating that Ms. Richardson "did not have the technical skills to assist the IT team with Service Desk tickets" and that "[o]n several occasions, I assisted Richardson with technical aspects including:  logging into her Microsoft Outlook account; helping her to detect and remove viruses from her own computer; accessing the SAIS network while she was working remotely; and Microsoft SharePoint tasks including creating forms and maintaining the SharePoint links."  Aff. Mohammad Elahi ¶¶ 10–11, Defs.' Ex. 15 ("Elahi Aff."), ECF No. 40-17.

Given that Defendants have asserted legitimate, non-discriminatory reasons for suspending Ms. Richardson, the Court must determine whether Ms. Richardson has produced sufficient evidence for a reasonable jury to find that Defendants' asserted reasons were not the actual reasons for her suspension and that Defendants instead suspended her on the basis of her race.  *See Brady*, 520 F.3d at 494.  "There are multiple ways in which circumstantial evidence may support an inference that an employer's stated reason for a challenged employment action was not the actual reason, and that the real reason was prohibited discrimination or retaliation." *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015).  Ms. Richardson presents a variety of evidence in her attempt to support the requisite inference.

Ms. Richardson cites the way in which Mr. Petasis treated Ms. Grandval as evidence of pretext. *See Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) ("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination . . . by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group . . . ."); *Allen*, 795 F.3d at 40 (stating that a plaintiff may point to disparate treatment of similarly situated employees to support an inference of pretext). This comparison is less helpful here than in the context of the removal of her supervisory duties in September 2012. Ms. Richardson does not put forward any evidence showing that Ms. Grandval "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Phillips*, 937 F. Supp. at 37 (internal quotation omitted). While she claims that Ms. Grandval "was responsible for a complete shutdown of Astra whereas no one on campus could schedule a meeting or a classroom," Pl.'s Opp. at 12, she does not provide the Court with any context to understand what that means.[29] In any case, it is unclear from the record presented whether Ms. Grandval engaged in the same type of behavior that Defendants cite as the reasons for Ms. Richardson's suspension.

Ms. Richardson argues more convincingly that JHU failed to follow its own established procedures for disciplinary action. *See Walker*, 798 F.3d at 1092 ("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination . . . by citing . . . its deviation from established procedures or criteria."); *Allen*, 795 F.3d at 40 (stating that a plaintiff may point to evidence "that the employer failed to 'follow

---

[29]     Ms. Richardson's only citation is to an inexplicably excerpted e-mail exchange dated August 24, 2012 that references "ASTRA" but does not indicate a "complete shutdown" or otherwise explain what occurred. *See* Pl.'s Ex. 51, ECF No. 43-4.

established procedures or criteria'" (quoting *Brady*, 520 F.3d at 495)).  Ms. Richardson's

suspension was founded upon her failure to "meet, fully, partially and/or consistently, corrective

actions and performance improvements as outline [sic] in the Final Written Warning."  Defs.'

Ex. 32 at JHU00581.  Through JHU's internal appeals process, however, JHU's Vice President

for Human Resources determined that the Final Written Warning "should not have been elevated

to a final warning."  Defs.' Ex. 31 at SDR001058.  Though JHU considered only the

appropriateness of the Final Written Warning and did not discuss the resulting suspension, its

determination that it did not follow its own established procedures and criteria for issuing a Final

Written Warning undermines the notion that JHU acted properly in suspending Ms. Richardson,

rather than issuing her another written warning or taking some other form of discipline. [30]

On the other hand, JHU cites its disciplinary policy as stated in its Staff Handbook.  *See*

Defs.' Ex. 5 at JHU00466–67, ECF No. 40-7.  The policy makes no mention of a "final" written

warning and speaks in permissive terms as to its progressive counseling and disciplinary action

---

[30]  In their briefs, the parties also dispute whether Defendants' discipline of Mark Golding, Ms. Richardson's Caucasian predecessor, establishes an inference of discrimination.  Ms. Richardson presents an affidavit from Mr. Golding in which he states that he went through JHU's progressive discipline procedure, receiving two verbal warnings, a written warning, and probation before resigning his position in March 2011.  *See* Aff. Mark Golding, Pl.'s Ex. 19, ECF No. 44-1.  Ms. Richardson also provides the written warning that Mr. Petasis issued to Mr. Golding in April 2010.  *See* Pl.'s Ex. 20, ECF No. 42-21.  Surprisingly, however, Ms. Richardson simultaneously argues that "[i]t is unclear exactly if they were under the same standards" and that "[w]hile it is clear that Defendant Petasis took issues with Mr. Golding's work that is where the comparison should end."  Pl.'s Opp. at 11.  In light of this startling concession, the Court does not consider the evidence related to Mr. Golding here.  The Court therefore does not reach Defendants' argument that Ms. Richardson should not be permitted to introduce the Golding affidavit because she failed to disclose him as a witness during the discovery process. See Defs.' Reply at 4–5.  Nevertheless, the Court cannot help but note that Ms. Richardson only offers the affidavit to rebut Defendants' argument that Mr. Petasis treated Mr. Golding just as harshly for his poor performance as he treated Ms. Richardson.  See Defs.' Mem. Supp. at 11.  It is highly doubtful that Defendants could plausibly claim to be prejudiced by Ms. Richardson's introduction of this evidence.

policy.  *See id.* ("If the problem has not been corrected after counseling, your supervisor can give

you a written warning. . . .  In cases where deemed appropriate, the university can suspend or

terminate a staff member immediately without proceeding through progressive discipline.").  The

fact that JHU enjoyed wide discretion under its internal policy is insufficient; instead, JHU "must

articulate the reasons underlying the exercise of its discretion."  *Ibrahim v. N.Y. State Dep't of*

*Health, Office of Health Sys. Mgmt.*, 904 F.2d 161, 166 (2d Cir. 1990).  Defendants do not

specifically articulate the reasons in their briefing, but they offer evidence suggesting that both

Mr. Petasis and Ms. Hines genuinely believed that Mr. Petasis's February 2012 memorandum

constituted a first written warning, contrary to JHU's subsequent conclusion in its internal

appeals process.  *See, e.g.,* Petasis Dep. Tr. at 36:21–37:3 (testifying that a portion of his

memorandum "was guidance that, in my mind, was – was prescribing the course of action she

had to take, corrective action she had to take"); Hines Aff. ¶ 3 ("In or about February 2012,

George Petasis issued Sharon Richardson a memorandum counseling her on ways she needed to

improve her performance.").  The Court, however, cannot make credibility determinations at

summary judgment, and, in any case, the fact remains that JHU itself determined that it did not

follow its own standard procedures.

Ms. Richardson also attacks some of Defendants' factual claims underlying her Final

Written Warning and suspension.  *See Allen*, 795 F.3d at 40 (stating that a plaintiff may raise an

inference of pretext by showing that the employer is "lying about the underlying facts" (quoting

*Brady*, 520 F.3d at 495).  She points to justifications that Mr. Petasis provided during JHU's

internal appeals process as supposed "mistruths."  For example, the record indicates that during

Ms. Richardson's appeal of the Final Written Warning to Mr. Kunka, "Mr. Petasis alleged that

Ms. Richardson had 'redlines', such as:  not working after 5:00 p.m. . . . ."  Pl.'s Ex. 9 at

JHU00519.  Ms. Richardson, however, provides extensive and unchallenged documentation in the form of calendar entries for the year of 2012 indicating that she frequently worked past 5:00 p.m.  *See* Pl.'s Ex. 29, ECF No. 42-29.  Defendants do not address this evidence in their motion for summary judgment, and, to the extent that they have abandoned the "red line" justification, that only further supports an inference of pretext.  *See Allen*, 795 F.3d at 40 (stating that "'changes and inconsistencies' in the employer's given reasons for the decision" support an inference of pretext (quoting *Brady*, 520 F.3d at 495)).  Ms. Richardson also challenges Defendants' factual claim that she walked out of meetings.  *See* Richardson Aff. ¶ 146 ("September 2012 or any other month, I never stomped or walked out of any meeting during my employment with JHU SAIS.").

　　　　Conversely, a closer inspection of the record indicates that several of Ms. Richardson's other accusations of "mistruths" during JHU's internal appeals process are unfounded.  For example, Ms. Richardson claims that Mr. Petasis somehow lied about whether she and Mr. Daniel knew each other by sensationally stating that "[a]ll African Americans do not know each other."  Pl.'s Opp. at 16.  The cited evidence indicates that Mr. Petasis in no way stated or implied that Ms. Richardson and Mr. Daniel must have known each other because they are both African-American.  *See* Pl.'s Ex. 9 at JHU00520–21.[31]  Rather, the record indicates that Mr. Petasis said that, among other things, Ms. Richardson recommended Mr. Daniel for his position and later worked with him and that Mr. Daniel made comments about Ms. Richardson teaching him things.  *See id.*[32]

---

[31]　　　Ms. Richardson actually cites Plaintiff's Exhibit 23, which consists solely of a handwritten note referring to Plaintiff's Exhibit 9.  *See* Pl.'s Ex. 23, ECF No. 42-24.

[32]　　　Similarly, Ms. Richardson makes the baseless claim that Mr. Petasis's reported statement during the investigation that Ms. Richardson "was not forthcoming" about whether she received a training certification when asked was an "egregious misstatement."  Pl.'s Opp. at 14 (quoting

Moreover, the contemporaneous evidence, particularly e-mails that Ms. Richardson sent

to Mr. Petasis and her co-workers, offer support for Defendants' claim that she was

insubordinate and unprofessional, particularly around the time of her Final Written Warning and

suspension.[33]

_____

Pl.'s Ex. 9 at JHU00518). Ms. Richardson cites Plaintiff's Exhibit 24 for support, which she
states is an e-mail from Mr. Petasis. *See id.* (citing Pl.'s Ex. 24). But Ms. Richardson did not
file an Exhibit 24. Even if Ms. Richardson's description of the supposed exhibit is accurate, it
appears that Mr. Petasis merely referenced the training Ms. Richardson received and made no
mention of whether she received a certificate. *See id.* Ms. Richardson also cites her own self-
serving affidavit (generally, without any pincite) for the proposition that she "personally thanked
Defendant Petasis for the opportunity after completing and receiving [the] certification." *Id.* Yet
it is unclear what portion of the affidavit she references or how it indicates that Mr. Petasis was
untruthful.

Ms. Richardson's claims regarding Ms. Hines provide another apt example. Ms.
Richardson claims that Ms. Hines had "selective memory" regarding "violence on the JHU-SAIS
campus." *See* Pl.'s Opp. at 15. Ms. Richardson claims that Ms. Hines testified during her
deposition that she could recall only one instance of violence on campus, which was Ms.
Richardson's apparent statement to Ms. Grandval on one occasion that they should "take it
outside," and could not recall Ms. Richardson's complaint regarding Ms. Grandval threatening
her life. *See id.* As support, Ms. Richardson inexplicably provides the Court with only a very
brief excerpt of Ms. Hines's deposition transcript that does not contain Ms. Hines's full
testimony on this issue. *See* Pl.'s Ex. 5 at 64:2–22, ECF No. 42-8. In the excerpt, Ms. Hines
testified that she had received "allegations of workplace violence," and that, when asked who
made those allegations, her first response was "I had one from Deborah Grandval." *See id.* at
64:10–16. In this excerpt, she did not state that Ms. Grandval's complaint was the *only*
complaint she received or that she could not recall any complaint by Ms. Richardson.

[33]     *See, e.g.,* Defs.' Ex. 27 at JHU00380 (August 13, 2012 e-mail to Mr. Petasis, copying
others: "I know how to put an Out of Office Message…..(*that M.B.A. paid off*) . . . ." (emphasis
in original)); *id.* at JHU00385 (August 13, 2012 e-mail to Mr. Petasis and Ms. Grandval: "My
'shredding' information is missing!!!! That would have been helpful in writing procedures….Oh
well….It walked away!!!!!!"); *id.* at JHU00388 (August 20, 2012 e-mail to Ms. Grandval,
copying others: "I have no time for nonsense . . . . If this is a priority, come out of your meeting
and let's talk about details . . . ."); *id.* at JHU00392 (e-mail to Ms. Grandval, copying others: "I
WILL NOT ACCEPT OWENRSHIP [sic] OF PROBLEMS/ISSUES THAT INCURRED [sic]
DURING MY NON-INVOLVEMENT OR ABSENCE ….nor am I going through every email, I
don't have that bandwidth…. And I can '**speak/communicate**' not only read…." (emphasis in
original)); *id.* at JHU00404 (September 7, 2012 e-mail exchange in which Mr. Petasis writes to
Ms. Richardson, copying Ms. Hines, that her comment to him that if he did not respond to her e-
mail by 5 p.m. that she would "make [her] own decisions and [Mr. Petasis] would have to live
with them" was "highly inappropriate and should not be repeated"); Defs.' Ex. 18 (September
11, 2012 e-mail in which Mr. Petasis writes to Ms. Richardson after she copies a staff member

The upshot of the Court's review of the record before it, eschewing credibility determinations and viewing the evidence in the light most favorable to Ms. Richardson, is that the evidence is not "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. A reasonable juror could conclude, based upon this evidence, that Defendants' proffered reasons for suspending Ms. Richardson in December 2012 were pretextual. "Typically, successful rebuttal of an employer's stated reason counts as evidence of the invidious motive that is a required element of a disparate treatment or retaliation claim." *Allen*, 795 F.3d at 40. The Supreme Court has recognized an exception for cases in which "the plaintiff's evidence calling the employer's proffered reason into doubt is weak, and the record also contains 'abundant and uncontroverted independent evidence that no discrimination has occurred.'" *Id.* (quoting *Reeves*, 530 U.S. at 148). This is not such a case. Nor is it a case in which "the plaintiff's showing of fabrication by her employer 'conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation.'" *Id.* (quoting *Aka*, 156 F.3d at 1290–91).

Accordingly, the Court finds that Ms. Richardson has successfully satisfied her burden of producing "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady*, 520 F.3d at 494. JHU is not entitled to summary judgment on this aspect of Ms. Richardson's discrimination claims.

---

on a reply to Mr. Petasis that he "asked you on multiple occasions to not share my emails with your employees as often these discussions are meant to stay at a management level").

### C.  Other Discrimination Claims

In addition to the three discrete discriminatory actions discussed, *supra*, Ms. Richardson also alleges that JHU discriminated against her on the basis of her race in two similar, yet distinct, ways that are less tangible:  first, she claims that JHU, through the conduct of the Individual Defendants, created a hostile work environment; and second, she claims that, as a culmination of the hostile work environment and the terms of her suspension, her resignation constituted a constructive discharge.

#### 1.  Hostile Work Environment

Count VI of Ms. Richardson's Amended Complaint is a claim against JHU for creating a hostile work environment through discrimination brought under Section 1981, Title VII, and the DCHRA.[34]  *See* Am. Compl. ¶¶ 145–50.  Hostile work environment claims under Section 1981, Title VII, and the DCHRA are analyzed using the same standards.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 n.3 (D.C. Cir. 2000) ("[T]he same framework is used for evaluating claims under 42 U.S.C. § 1981" and Title VII); *Ali v. District of Columbia*, 697 F. Supp. 2d 88, 92 n.6 (D.D.C. 2010) (stating that the D.C. Court of Appeals "has made clear that federal case law addressing questions arising in Title VII cases is applicable to the resolution of analogous issues raised regarding DCHRA claims" (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 & n.3 (D.C. 1994)).

---

[34]      Though the Amended Complaint separately brings claims for discrimination under Section 1981, Title VII, and the DHCRA under Counts I, II, and III, the parties construe Count VI as also being brought under those statutes, though the Amended Complaint is not specific, and the Court does the same.  The Amended Complaint alleges only that the hostile work environment was motivated by race discrimination and does not allege that it was motivated by retaliation.  *See* Am. Compl. ¶ 146.

To establish a prima facie hostile work environment claim, Ms. Richardson must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her race; and (4) the harassment affected a term, condition, or privilege of her employment. *See Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005); *Kelley v. Billington*, 370 F. Supp. 2d 151, 156 (D.D.C. 2005); *see also Elam v. Bd. of Trs. Of Univ. of D.C.*, 530 F. Supp. 2d 4, 21 n.7 (D.D.C. 2007) ("The elements of a hostile work environment claim under the DCHRA mirror the federal requirements." (citing *Lively v. Flexible Packaging Ass'n.*, 830 A.2d 874, 889 (D.C. 2003))). Defendants argue that Ms. Richardson cannot establish that the unwelcome harassment she alleges occurred because of her race or that it affected a term, condition, or privilege of her employment. *See* Defs.' Mem. Supp. at 15–22. The Court first summarizes the alleged unwelcome harassment and then addresses each of these issues in turn.

### a. Unwelcome Harassment

Defendants do not challenge whether Ms. Richardson was subject to unwelcome harassment. Nevertheless, it is helpful for the Court to briefly summarize the conduct that Ms. Richardson alleges constituted harassment. In addition to the discrete discriminatory actions of removing her supervisory duties, reassigning her to the Service Desk, and suspending her, Ms. Richardson describes the following "[i]ncidents of abusive behavior" that are not independently actionable. *See* Pl.'s Opp. at 28–29.

Ms. Richardson alleges that the harassment began almost immediately when Mr. Petasis "yelled and screamed at [her] in a physically hostile manner" on May 5, 2011. Richardson Aff. ¶ 11. *See also* Defs.' Ex. 7 (handwritten note dated May 11, 2011 describing the incident). She alleges that the harassment continued in September 2011 when Mr. Petasis touched her shoulder

in a way that made her feel uncomfortable.[35]  *See* Richardson Dep. Tr. at 235:17–241:17.

According to Ms. Richardson, Mr. Petasis's harassment of her continued when, in January 2012,

he yelled at her for requesting a meeting with Human Resources.[36]  *See* Richardson Aff. ¶ 28;

Pl.'s Ex. 11.  She alleges that Mr. Petasis's yelling was frequent.  *See* Richardson Aff. ¶ 10

("Defendant Petasis frequently invaded my personal space by yelling and screaming while

simultaneously slamming his fist on the desk.").

　　　　Ms. Richardson alleges that the harassment became more serious when Ms. Grandval

threatened her with physical violence and Mr. Petasis and Ms. Hines did nothing about it.  Ms.

Richardson claims that Ms. Grandval first engaged in threatening behavior on February 22, 2012

when she entered her office and lunged in her face while yelling at her.  Ms. Richardson

discussed this incident with Mr. Petasis and Ms. Hines during a meeting soon thereafter, and Ms.

Richardson claims that Ms. Hines observed Mr. Petasis yell at her during the meeting.  *See*

Defs.' Ex. 11; Pl.'s Ex. 50, ECF No. 43-5 (undated memorandum authored by Ms. Richardson

characterizing this meeting as "just heated yelling and misrepresentation of facts").  According to

Ms. Richardson's deposition testimony, Ms. Grandval's behavior escalated when, on May 9,

2012, Ms. Grandval came into her office following a meeting with Mr. Petasis and threatened to

hurt her and take her job.  *See* Richardson Dep. Tr. at 334:14–336:9.  She alleges that she

---

[35]　　　In her opposition to Defendants' motion for summary judgment, Ms. Richardson refers to this incident by stating that Mr. Petasis "sexually harassed Plaintiff by an unwelcome sexual conduct."  Pl.'s Opp. at 28.  Ms. Richardson's hostile work environment claim, however, rests solely on a claim of racial discrimination.  Ms. Richardson does not bring a claim for sexual harassment against Mr. Petasis, despite this characterization.

[36]　　　In her opposition to Defendants' motion for summary judgment, Ms. Richardson quotes Mr. Petasis as yelling, "What the hell did you request a meeting with human resources for?"  Pl.'s Opp. at 28.  The citation for this quote is Ms. Richardson's affidavit and no pincite is provided.  The Court cannot locate any source in the record for this quotation.

reported this threat to Mr. Petasis and told him that she did not feel safe or comfortable around Ms. Grandval and that Mr. Petasis did nothing about it.  *See* Defs.' Ex. 13.

Ms. Richardson claims that the harassment continued when, on June 4, 2012, Mr. Petasis "yelled and screamed" at her again and "invited Defendant Grandval to join in his interrogation of [her] and she did."  Richardson Aff. ¶¶ 54–55.  She alleges that Mr. Petasis threatened to take her to Human Resources in response to a complaint that Ms. Grandval made about her.  *See id.* ¶¶ 57–59.  Ms. Richardson states that, as a result of this meeting, she had to be taken to a hospital in an ambulance and missed work.  *See id.* ¶ 59.  She states that due to all of this harassment, she was forced to seek mental health treatment and take a leave of absence from work in the summer of 2012.  *See* Richardson Aff. ¶¶ 63–65.

Ms. Richardson alleges that the harassment continued until the end of her employment, as Mr. Petasis gave her supervisory duties to Ms. Grandval, reassigned her to the Service Desk, issued her a Final Written Warning, and ultimately suspended her.  Ms. Richardson also states that Mr. Petasis's "battery" of Roger Daniel shortly before her suspension was abusive towards her, because she witnessed it.  *See* Pl.'s Opp. at 29.

### b.  Evidence of Racial Motivations

In order to survive summary judgment on her hostile work environment claim, Ms. Richardson must offer evidence from which a reasonable jury could find that "the hostile work environment was the result of discrimination based on a protected status."  *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 163 (D.D.C. 2007).

Inexplicably, in the section of her opposition to Defendants' motion for summary judgment concerning her hostile work environment claim, Ms. Richardson focuses exclusively on Mr. Petasis's use of the term "boy" to refer to male staff members, coupled with his alleged

battery of Mr. Daniel, to support this element of her hostile work environment claim.  *See* Pl.'s

Opp. at 30.  The Court has already discussed the insufficiency of this evidence with respect to

Ms. Richardson's claims for discrete discriminatory actions, finding that it does not raise an

inference of discrimination.  That evidence is also insufficient here, particularly because it bears

no linkage or correlation to the other alleged harassing actions.  *Cf. Bryant v. Brownlee*, 265 F.

Supp. 2d 52, 64 (D.D.C. 2003) ("[W]ith the exception of [two incidents], none of the events

described in plaintiff's 21-page complaint have any racial or age-related overtones.  They are

completely neutral with regard to these protected classifications.").  In fact, Ms. Richardson

admits that no JHU employee ever made any racially derogatory marks to her during her

employment at JHU.  *See* Defs.' SOF ¶ 46; Pl.'s Stmt. Facts ¶ 46.

Nevertheless, the Court must also consider here the evidence that it considered in

connection with Ms. Richardson's claims of discrete discriminatory actions, because Ms.

Richardson's hostile work environment claim encompasses those discrete discriminatory actions,

and the remainder of her hostile work environment claim primarily concerns Mr. Petasis's

conduct.  The Court considered evidence that Mr. Petasis treated Ms. Grandval, who was

similarly situated to Ms. Richardson, different from how he treated Ms. Richardson without any

proffered justification by, among other things, inviting Ms. Grandval to certain meetings and

excluding Ms. Richardson from them, removing Ms. Richardson's access to a shared calendar

but maintaining Ms. Grandval's access, and giving Ms. Richardson's supervisory duties to Ms.

Grandval.  The Court also considered evidence that, among other things, Ms. Richardson was not

disciplined in accordance with JHU's normal procedures and that Mr. Petasis previously

provided at least one false justification for Ms. Richardson's Final Written Warning.  Based upon

all of this evidence, the Court held that that Ms. Richardson has presented sufficient evidence to

raise an inference of race discrimination and to support a finding that the proffered reasons for her suspension were pretextual.  The Court's reasoning is equally applicable here.  Accordingly, the Court concludes that Ms. Richardson has, at least for purposes of opposing summary judgment, sufficiently shown that the alleged harassment she suffered was due to her race.

*c.  Effect on Terms of Employment*

The Court therefore turns to the final element of Ms. Richardson's hostile work environment claim:  whether the alleged harassment affected a term, condition, or privilege of her employment.

The Supreme Court has held that, in order to satisfy this element, the alleged harassment must be so "severe or pervasive" as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation omitted).  "In order to be actionable under [Title VII], a[n] . . . objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Id.* at 787 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  To determine whether an environment is objectively abusive, courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.  *See also Baloch*, 550 F.3d at 1201.  "[I]solated incidents . . . will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788.

There is no doubt here that the harassment that Ms. Richardson alleges was subjectively abusive, as it is uncontested that, even before the actionable discrete discriminatory actions, the

alleged harassment caused her to seek urgent medical attention and, for medical reasons, take a leave of absence.  Though the issue of whether the harassment was objectively abusive is less clear, the Court's consideration of the totality of the circumstances leads it to conclude that, viewing the evidence in the light most favorable to Ms. Richardson and without making any credibility determinations, a reasonable juror could conclude that it was.  This is not a case that involves isolated, infrequent instances of harassment.  Rather, Ms. Richardson alleges that she suffered repeated and frequent harassment throughout the duration of her employment.  The severity and physical nature of the alleged harassment is also highly relevant.  Beyond simply screaming and invading her personal space, she also alleges that she was the victim of threats of physical violence and that Mr. Petasis and the other Individual Defendants did nothing in response to ensure her safety or assuage her fears.  Assuming the veracity of these allegations, a reasonable person in Ms. Richardson's position would find that conduct, particularly in combination with the removal of her supervisory duties, reassignment, Final Written Warning, and suspension—all of which took place within the span of a few months—to be abusive.

The Court is not persuaded by Defendants' arguments to the contrary.  In their motion for summary judgment, Defendants largely rely on *Clemmons v. Academy for Educational Development*, 70 F. Supp. 3d 282 (D.D.C. 2014), in which the court held that the plaintiff's claims that she received rude e-mails and that her co-workers rolled their eyes at her and spread false rumors about her did not affect the terms, conditions, and privileges of her employment.  *See* 70 F. Supp. 3d at 298–300.  The allegations in this case, which involve much more severe forms of harassment, are plainly distinguishable.  Moreover, the court in *Clemmons* reached its holding after first finding that the plaintiff received assurances of her job security.  *See id.* at 299.  In stark contrast, Ms. Richardson's employment was explicitly and formally threatened, and, as

discussed, *infra*, she may have been constructively discharged.  Defendants do not even address these distinctions in their motion.  Instead, they seem to conflate the elements of a hostile work environment claim, arguing only that Ms. Richardson "cannot establish that her conflict with Petasis or Grandval affected the terms or conditions of her employment" because she cannot demonstrate a connection between the harassment and her race.  Defs.' Mem. Supp. at 22.

Accordingly, JHU is not entitled to summary judgment on Ms. Richardson's hostile work environment claim.

### 2.  Constructive Discharge

Ms. Richardson's Amended Complaint also claims that, though she resigned from JHU in January 2013, she was constructively discharged "due to discriminatory harassment by Mr. Petasis."  Am. Compl. ¶ 116.  *See also id.* ¶ 119.  The Amended Complaint does not plead constructive discharge as a separate count, and, therefore, the Court construes this claim as falling within Counts I, II, and III brought under Section 1981, Title VII, and the DCHRA, respectively, alleging discrimination.[37]  *See Pa. State Police v. Suders*, 542 U.S. 129, 142–43 (2004) (holding that "Title VII encompasses employer liability for a constructive discharge"); *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 80–81 (D.D.C. 2008) (constructive discharge claim brought under the DCHRA); *Villines v. United Brotherhood of Carpenters & Joiners of Am., AFL-CIO*, 999 F. Supp. 97 (D.D.C. 1998) (constructive discharge claim brought under Section 1981).  As discussed, *supra*, discrimination claims brought under Section 1981 and the DCHRA are evaluated using the same framework as claims brought under Title VII.  *See Lemmons*, 431 F. Supp. 2d at 86 (citing *Mungin*, 116 F.3d at 1553).

---

[37]     As discussed, *infra*, the Court also reads the Amended Complaint to allege that Ms. Richardson was also constructively discharged in retaliation for protected activity.

In order to prevail on her claim of discriminatory constructive discharge in this Circuit, Ms. Richardson must show that intentional discrimination existed, her employer deliberately made working conditions intolerable, and aggravating factors justified her conclusion that she had no option but to end her employment. *See Hendrix v. Napolitano*, 77 F. Supp. 3d 188, 193 (D.D.C. 2015) (quoting *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001)). "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006) (citing *Mungin*, 116 F.3d at 1558).

The Court has already found that, with respect to her hostile work environment claim, Ms. Richardson has demonstrated, at least for purposes of opposing a motion for summary judgment, that she was subjected to intentional discriminatory harassment and that the harassment affected the terms and conditions of her employment. Ms. Richardson's constructive discharge claim, therefore, turns on "whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010).

Defendants rely heavily on *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55 (D.D.C. 2006). In that case, the court observed that "absent some indication that an employer was trying to drive the employee from the workplace entirely or that the employee 'quit just ahead of the fall of the axe,' the law will not permit a resignation to be transformed into a discharge." *Kalinoski*, 435 F. Supp. 2d at 78 (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). The plaintiff in that case argued that her employer's denial of her medical leave requests following a reassignment and an accompanying decision to place her on leave without pay constituted a constructive discharge. *See id.* at 79. The court disagreed, finding that "[t]he personnel

decisions, even if found to be unlawful under Title VII, may have been career-harming, but there has been no evidence offered to show that they were essentially career-*ending*." *Id.* at 79 (emphasis in original). The court based its conclusion on several facts. The court observed that there was no evidence that "the adverse actions would be interpreted by a reasonable person as a sign of imminent termination or even as an indication that defendant no longer wanted plaintiff to continue working at the agency." *Id.* at 80. On the contrary, in that case, "all the evidence indicate[d] that defendant wanted plaintiff to remain as an employee." *Id.* The court also found that, though the plaintiff had been placed on leave without pay, she "had the option of resuming work in her new position or staying out on leave without pay until such time as she was terminated." *Id.* Defendants here argue that, similar to *Kalinoski*, "[t]he paid administrative leave was not a sign of imminent termination, but an opportunity for Richardson to improve and do her job satisfactorily." Defs.' Mem. Supp. at 28.

The Court does not share Defendants' view of the record. The Court has already found, *supra*, that a reasonable juror could conclude that, among other things, Mr. Petasis removed Ms. Richardson's supervisory duties and reassigned her to a lesser position while preventing her from succeeding at that position by forcing her to work without the necessary assistance of other staff members. More importantly, Ms. Richardson was suspended and informed that she would only be permitted to continue her employment if she satisfactorily completed two tasks by a certain date. Even assuming that those actions alone would be insufficient to support a constructive discharge claim, Ms. Richardson presents uncontroverted evidence that Mr. Petasis prevented her from completing one of the two tasks by removing her access to necessary systems and by instructing staff members not to provide her with necessary information. *See* Richardson Aff. ¶¶ 139–41. Defendants do not challenge these factual allegations. They do not, for example,

provide any testimony from Mr. Petasis disputing Ms. Richardson's claim that he instructed staff members not to provide her with necessary information.  Nor do Defendants provide any testimony from Mr. Elahi, whom Ms. Richardson quotes as stating that "the staff was directed not to help you," Richardson Aff. ¶ 139, though they provide an affidavit from him concerning other issues.  *See* Elahi Aff.  Instead, Defendants simply argue that whether Mr. Petasis prevented Ms. Richardson from completing one of the two tasks is immaterial, because "she does not assert that she ever attempted to comply with the second condition of her return to work." Defs.' Reply at 20.  This argument is illogical.  Even if Ms. Richardson had completed the second condition in stellar fashion, by the very terms of her suspension, she would have been terminated.  *See* Defs.' Ex. 32 at JHU00582 (stating that the tasks were "part of your return to work and without them you will not have met the criteria to return to work" and that "[f]ailure by you to meet expectations will result in termination").

Unlike the plaintiff in *Kalinoski*, a reasonable employee in Ms. Richardson's position could interpret her employer's actions as "a sign of imminent termination" and as an indication that Defendants no longer wanted her to remain an employee of JHU.  Also unlike the plaintiff in *Kalinoski*, Ms. Richardson did not have the option of returning to work.  Instead, her unchallenged evidence indicates that the terms of her suspension and Mr. Petasis's actions left her with no means of returning to work at JHU.  These facts, if found by a jury, would constitute the necessary aggravating factors for a constructive discharge claim.  *See Clark*, 665 F.2d at 1174 (holding that aggravating factors were present because the plaintiff was "essentially locked into a position from which she could apparently obtain no relief").  *Cf. Harris*, 590 F. Supp. 2d at 81 (granting summary judgment in favor of defendant in part because the plaintiff had "presented no evidence that even suggests that the defendant was seeking to end his career by transferring

him to a position his supervisors knew he could not perform and was therefore predestined to fail").

Accordingly, JHU is not entitled to summary judgment on the constructive discharge aspect of Ms. Richardson's discrimination claims.

### D.  Retaliation

Count V of the Amended Complaint is a claim for retaliation brought under Section 1981, Title VII, and the DCHRA.  *See* Am. Compl. ¶¶ 141–44.

Retaliation claims brought under these statutes are subject to the same burden-shifting framework under *McDonnell Douglas* as claims for discrimination.  *See Allen*, 795 F.3d at 39.  A plaintiff bringing a retaliation claim under Title VII based on circumstantial evidence establishes a prima facie case by showing:  "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)).  A materially adverse action for purposes of a retaliation claim is one that a reasonable employee would find to be materially adverse, meaning that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation omitted).

As with discrimination claims, once the employer proffers a legitimate, non-retaliatory reason for the challenged employment action, "the burden-shifting framework falls away, and the 'central question' becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the

employee.'"  *Allen*, 795 F.3d at 39 (quoting *Brady*, 520 F.3d at 494) (alterations omitted).  The Supreme Court has ruled that Title VII retaliation claims, unlike status-based discrimination claims, "require proof that the desire to retaliate was the but-for cause of the challenged employment action," rather than merely a "motivating factor."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

Here, Ms. Richardson claims that she suffered several distinct materially adverse employment actions in retaliation for several protected activities.  She claims:  (1) Mr. Petasis yelled at her on January 24, 2012 in retaliation for requesting a meeting with Human Resources to discuss his conduct earlier that month; (2) Mr. Petasis excluded her from at least one meeting in June 2012 in retaliation for complaining to him about Ms. Grandval's threatening conduct the previous month; (3) Mr. Petasis authorized Ms. Grandval to assume Ms. Richardson's supervisory duties in September 2012 in retaliation for her first EEOC complaint in August 2012; (4) the Final Written Warning, together with her reassignment to the Service Desk, in September 2012 was also in retaliation for her first EEOC complaint; and (5) she was suspended in December 2012 in retaliation for complaining about Mr. Petasis's battery of Mr. Daniel three days prior and for her other protected activity.  *See* Pl.'s Opp. at 24–27.

Defendants argue that, of these activities, only Ms. Richardson's complaints to the EEOC were statutorily protected activity and that, even assuming that Ms. Richardson suffered materially adverse actions, she cannot establish the requisite causal link between those actions and her protected activity.  *See* Defs.' Mem. Supp. at 29–31.  The Court addresses each of Ms. Richardson's claims of retaliation in turn.

### 1. Mr. Petasis's Yelling in January 2012

Ms. Richardson claims that on January 24, 2012, Mr. Petasis yelled at her in retaliation for requesting a meeting with Human Resources.  *See* Pl.'s Opp. at 24–25; Richardson Aff. ¶ 28. Defendants do not proffer a legitimate, non-retaliatory reason for Mr. Petasis's conduct, and, therefore, Ms. Richardson must establish a prima facie case of retaliation under the *McDonnell Douglas* framework.

Ms. Richardson must first show that her request for a meeting with Human Resources was a statutorily protected activity.  "An activity is protected for the purposes of a retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Lemmons*, 431 F. Supp. 2d at 91 (internal quotation omitted).  The "alleged discriminatory treatment" cannot be "generic; rather, the plaintiff must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation."  *Id.* at 91–92 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (stating that the complaint "must in some way allege unlawful discrimination")). Therefore, Ms. Richardson only engaged in protected activity for purposes of her retaliation claim if, in her request to meet with Human Resources, she alleged harassment or discrimination on the basis of race in violation of Section 1981, Title VII, or the DCHRA.

Ms. Richardson provides no evidence to support a finding that her request to meet with Human Resources in mid-January 2012 was to discuss harassment or discrimination on the basis of race.  Though Ms. Richardson states in her opposition to Defendants' motion for summary judgment that she requested this meeting in order to "discuss [Mr. Petasis's] continued reference to minority men of color as 'boy,'" no citation is provided for that factual assertion.  Pl.'s Opp. at 24–25.  The limited evidence that the Court can locate in the record concerning Ms.

Richardson's mid-January 2012 request does not indicate that it was to discuss Mr. Petasis's use of the term "boy" or any other allegations of race discrimination.[38]  In her affidavit, Ms. Richardson simply states that "[o]n January 22, 2012, Defendant Petasis yelled at me for requesting a meeting with human resources" without further detail.[39]  Richardson Aff. ¶ 28.  A memorandum that Ms. Richardson appears to have written two days after the alleged yelling incident indicates that, contrary to her naked assertion opposing summary judgment, she had requested to meet with Human Resources to discuss staffing issues and provided Mr. Petasis with only two hours' notice, which prompted his yelling.  *See* Pl.'s Ex. 11.  She wrote:

> You grilled me about why I didn't talk to you first before setting up a meeting with Human Resources, Shanna Hines.  You were provided two hours prior notification for a matter of serious importance. . . . .  *You indicated that you did not need HR to make decisions for us regarding IT staffing.*  "You are not going to be blackmailed by Chris."  Your voice was extremely loud and to the point of yelling.  Abrasively, you asked, why are we meeting about Chris?  I told you that this was not just about Chris:  I simply coordinated with Shanna Hines/HR, in her office, first checking your availability and disseminated a meeting invite *to bring closure and clarity regarding the open requisition and IT staffing needs.*

---

[38]     Ms. Richardson admits in response to Defendants' Statement of Facts that she actually raised issues concerning Mr. Petasis's use of the term "boys" during her September 2011 meeting months earlier with Mr. Kunka and Ms. Hines in which she generally discussed her and her staff's concerns about Mr. Petasis's behavior.  *See* Defs.' SOF ¶¶ 22–23; Pl.'s Stmt. Facts ¶¶ 22–23.  As discussed, *supra*, during that meeting, Ms. Richardson appears to have relayed Mr. Berbano's complaint that he did not like being referred to as Mr. Petasis's "boy" because he was a "grown-ass man."  Richardson Dep. Tr. at 273:13–274:7.  *See also* Defs.' Ex. 8 at SDR000992.  Her memorandum summarizing the meeting does not indicate that she expressed to Mr. Kunka and Ms. Hines her personal feelings that the term was offensive due to its association with the history of slavery, and, during her deposition, she testified that, to the best of her knowledge, the account provided in the memorandum was true and complete.  *See* Richardson Dep. Tr. at 275:20–276:5.  In any case, Ms. Richardson does not claim that Mr. Petasis or anyone else retaliated against her for discussing this issue in September 2011.  Nor does she present any evidence that Mr. Petasis even knew about the issues that she raised with Mr. Kunka and Ms. Hines.

[39]     Ms. Richardson's statement conflicts with other accounts of the yelling incident occurring on January 24, 2012.  *See* Pl.'s Ex. 11.

*Id.* at JHU00246 (emphasis added).[40]  Similarly, a memorandum that Mr. Petasis wrote to Ms.

Richardson in response also indicates that Ms. Richardson's request to meet with Human

Resources concerned staffing issues, rather than allegations of racial discrimination, and that Mr.

Petasis was upset about being provided with a last minute notice.  *See* Pl.'s Ex. 22 at JHU00235

("Discussion in the IT Conference Room on 1/24/2012 with regards to your appointment for a

meeting at 4pm sent to me around 2pm of the same day instructing me to attend a meeting with

HR on IT Staffing Solutions without offering me an agenda, despite a critical 4:30pm meeting

with a tight deadline, telling me that it needs to happen.").[41]

     Ms. Richardson provides no evidence to establish that Mr. Petasis yelled at her on

January 24, 2012 in retaliation for engaging in protected activity, and therefore, JHU is entitled

to summary judgment as to this aspect of Ms. Richardson's retaliation claims.[42]  *See, e.g.,*

*Lemmons*, 431 F. Supp. 2d at 92–93 (granting summary judgment in favor of defendants because

the only protected activity that plaintiff identified was a complaint that alleged harassment

generally); *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d. 209, 213–14 (D.D.C. 2006)

(agreeing with defendant that because plaintiff "complained about the evaluation process, his

supervisors and harassment but not about matters protected by anti-discrimination laws," he did

not establish that he engaged in statutorily protected activity).

---

[40]    In this memorandum, Ms. Richardson also wrote, regarding Mr. Petasis yelling at her on January 24, 2012:  "Is this rough and harsh behavior because of my gender, race or ethnicity?"  Pl.'s Ex. 11 at JHU00246.  The Court need not decide whether asking this question constituted statutorily protected activity, because it was made *after* and *in response to* the yelling incident.  Ms. Richardson does not claim that she suffered any retaliation for asking this question.

[41]    Mr. Petasis's memorandum references a relevant e-mail exchange attached as an appendix to the memorandum.  *See* Pl.'s Ex. 22 at JHU00235.  Ms. Richardson does not, however, provide the appendix to the Court, which would have been helpful.

[42]    The Court does not reach the issue of whether Mr. Petasis's yelling constituted a materially adverse action.

2. Exclusion from a Meeting on June 4, 2012

Ms. Richardson claims that on June 4, 2012, Mr. Petasis excluded her from an important meeting in retaliation for reporting Ms. Grandval's alleged threat of physical violence on May 9, 2012.[43] Defendants do not proffer a legitimate, non-retaliatory reason for Mr. Petasis's exclusion of Ms. Richardson from the meeting, and, therefore, Ms. Richardson must establish a prima facie case of retaliation under the *McDonnell Douglas* framework.

Ms. Richardson fails to establish that her complaint to Mr. Petasis and Human Resources regarding Ms. Grandval was a statutorily protected activity. She provides no evidence whatsoever indicating that she raised issues concerning race discrimination in her complaint. On the contrary, the record before the court, including an e-mail from Ms. Richardson to Mr. Petasis and Ms. Hines informing them of the incident and a memorandum summarizing her subsequent conversation about the incident with Mr. Petasis and Ms. Hines, indicates that, while she complained about Ms. Grandval being threatening and indicated that she feared for her safety, she made no mention of any potential racial issue. *See* Defs.' Ex. 12 (e-mail to Ms. Hines and Mr. Petasis informing them of the incident); Defs.' Ex. 13 (memorandum summarizing discussion with Mr. Hines and Mr. Petasis regarding the incident). Ms. Richardson provides no evidence to establish that Mr. Petasis excluded her from the meeting on June 4, 2012 in retaliation for engaging in protected activity, and therefore, Defendants are entitled to summary judgment on this claim of retaliation.[44]

---

[43]     Ms. Richardson also states in a footnote in her opposition brief that "[t]his also occurred at or around October 17, 2012 when Defendants Grandval and Petasis attended an IT related event to Bologna, Italy." Pl.'s Opp. at 25 n.13. Ms. Richardson provides no citation for this factual claim and she does not allege that she was excluded from this trip in retaliation for her complaint regarding Ms. Grandval or for any other activity.

[44]     The Court need not reach the issue of whether Ms. Richardson's exclusion from the meeting constituted a materially adverse employment action.

3. Removal of Supervisory Duties in September 2012

Ms. Richardson claims that on September 11, 2012, Mr. Petasis authorized Ms. Grandval to assume her supervisory duties in retaliation for filing her first EEOC complaint for discrimination 29 days earlier on August 13, 2012.  As discussed, *supra*, with respect to Ms. Richardson's claim that this action was also discrimination, Defendants do not proffer a legitimate, non-retaliatory reason for the action, and, therefore, Ms. Richardson must establish a prima facie case of retaliation under the *McDonnell Douglas* framework.

*a. Statutorily Protected Activity and Materially Adverse Action*

There is no dispute that Ms. Richardson's filing of a formal EEOC complaint was a statutorily protected activity, the first prong of the prima facie analysis.  The Court also found, *supra*, that there is a genuine dispute as to whether Mr. Petasis authorized the removal of her supervisory duties and that this action, if true, would constitute an adverse employment action for purposes of a discrimination claim.  This analysis holds true with respect to whether the action would constitute a materially adverse action for purposes of a retaliation claim, the second prong of the prima facie analysis, which encompasses a broader range of actions than the anti-discrimination provision of Title VII.  The alleged removal of Ms. Richardson's supervisory duties "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal quotation omitted).

*b. Evidence of Causal Link*

Ms. Richardson's claim, therefore, turns on whether she can establish, for purposes of satisfying the third prong of the prima facie analysis, a causal link between her filing of the EEOC complaint on August 13, 2012 and the removal of her supervisory duties on September 11, 2012.  For purposes of making a prima facie case of retaliation, a plaintiff need not provide

any direct evidence of a causal connection. Rather, a plaintiff may establish the requisite

causation by "showing that the employer had knowledge of the employee's protected activity,

and that the adverse personnel action took place shortly after that activity." *Mitchell v.*

*Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). *See also Singletary v. District of Columbia*, 351

F.3d 519, 525 (D.C. Cir. 2003) ("[T]his circuit has held that a close temporal relationship may

alone establish the required causal connection.").

Here, the very close temporal proximity between Ms. Richardson's protected activity and

the materially adverse action is quite plain. Ms. Richardson filed her EEOC complaint on

August 13, 2012, and, at or around the same time, she filed a complaint with JHU's Office of

Institutional Equity. *See* Defs.' SOF ¶ 67; Richardson Aff. ¶ 66. Ms. Richardson alleges that

Mr. Petasis removed her supervisory duties on September 11, 2012, less than one month later.

*See* Richardson Aff. ¶¶ 67–68. This falls within the generally accepted range for establishing a

causal connection. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2001) ("[C]ourts

generally have accepted time periods of a few days up to a few months . . . ."). None of the

Individual Defendants claim that they were unaware of Ms. Richardson's EEOC filing and her

internal complaint at the time that the alleged removal of her supervisory duties occurred.[45] In

the absence of a proffered legitimate, non-retaliatory justification, the combination of temporal

proximity, uncontested knowledge of protected activity, and the frequency of other alleged

materially adverse actions is sufficient to raise an inference of retaliatory motive.

---

[45]     In addition, as discussed, *infra*, the record shows that Mr. Petasis was aware of Ms.
Richardson's EEOC filing and internal complaint at least as early as September 17, 2012, *see*
Defs.' Ex. 30 at SDR000996, and Ms. Hines stated during the internal appeals process that Ms.
Richardson informed her of her first EEOC filing upon returning to work in August 2012. *See*
Pl.'s Ex. 9 at JHU00514.

Accordingly, JHU is not entitled to summary judgment as to this aspect of Ms. Richardson's retaliation claims.

4.  Final Written Warning and Reassignment to the Service Desk in September 2012

Ms. Richardson claims that the combined actions of issuing her a Final Written Warning on September 13, 2012 and reassigning her to the Service Desk was in retaliation for filing her first EEOC complaint on August 13, 2012.

*a.  Materially Adverse Action*

Though Defendants argue that the Final Written Warning was not an adverse employment action for purposes of Ms. Richardson's discrimination claim, it is unclear from their briefing whether they also challenge whether the Final Written Warning was a materially adverse action for purposes of a retaliation claim, the definition of which encompasses a broader range of actions.  *See* Defs.' Mem. Supp. at 30 (arguing that "the alleged actions of retaliation against Richardson are limited to the Final Written Warning" and the suspension and arguing that "[e]ven assuming that the Final Written Warning" and the suspension were "adverse employment actions," Ms. Richardson cannot establish the requisite causation).  Nevertheless, the Court addresses this issue for clarity.

The D.C. Circuit addressed whether letters of reprimand and negative performance reviews may constitute materially adverse actions for retaliation purposes in *Baloch*.  *See* 550 F.3d at 1199.  The court held that the letters and negative performance reviews in that case did not constitute materially adverse actions because the letters "contained no abusive language, but rather job-related constructive criticism, which 'can prompt an employee to improve her performance'" and the plaintiff did not produce evidence demonstrating that the negative performance reviews "could affect his position, grade level, salary, or promotion opportunities."

*Id.* (quoting *Whittaker v. N. Ill. University*, 424 F.3d 640, 648 (7th Cir. 2005)). The court also cited with approval a Seventh Circuit decision holding that certain evaluations and written warnings were not adverse actions because "none had tangible job consequences." *See id.* (quoting *Whittaker*, 424 F.3d at 648). Summarizing the precedent in this Circuit, one court has stated that "[a] letter of counseling, written reprimand, or unsatisfactory performance review, if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action under Title VII." *Hyson v. Architect of the Capitol*, 802 F. Supp. 2d 84, 102 (D.D.C. 2011). Courts have also recognized that there is no rule that letters of reprimand are *per se* non-actionable, but, rather, "the case law is clear that the 'material adversity' inquiry is necessarily context-specific and 'is simply not reducible to a comprehensive set of clear rules.'" *Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 75 n.16 (D.D.C. 2011) (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011)).

The Court finds that Ms. Richardson's Final Written Warning was an actionable, materially adverse action. Though the Final Written Warning contained no abusive language, the record is clear that it was used as a predicate for Ms. Richardson's suspension, which had a tangible impact on the terms of Ms. Richardson's employment. Context also compels the Court's conclusion. Ms. Richardson received the Final Written Warning within days of the alleged removal of her supervisory duties and her reassignment to the Service Desk. The Court has already found that these actions independently constitute adverse employment actions, and the combined impact of those actions and the Final Written Warning certainly "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotation omitted).

*b. Defendants' Proffered Reasons and Evidence of Pretext*

Defendants proffer the same legitimate, non-retaliatory reasons for issuing Ms.

Richardson the Final Written Warning that they offer to justify her suspension:  her

insubordination and poor performance.  *See* Defs.' Mem. Supp. at 28–29.  The question,

therefore, is whether Ms. Richardson has produced sufficient evidence for a reasonable jury to

find that those reasons were not the actual reasons for the Final Written Warning and that JHU

retaliated against her.  The D.C. Circuit has stated that "[t]he temporal proximity of an adverse

action close on the heels of protected activity is a common and highly probative type of

circumstantial evidence of retaliation."  *Allen*, 795 F.3d at 40 (citing *Hamilton v. Geithner*, 666

F.3d 1344, 1357–59 (D.C. Cir. 2012)).  Here, the Final Written Warning came approximately

one month after Ms. Richardson filed her EEOC claim.

Defendants argue that Ms. Richardson cannot establish the requisite causation, because

"she cannot dispute that Petasis first disciplined her informally in February 2012, or that Petasis

and Hines started discussing the need for the Final Written Warning in June 2012, six months

and six weeks prior to Richardson filing the Charge, respectively."  Defs.' Mem. Supp. at 30.

Defendants' argument alludes to the Supreme Court's statement in an arguably analogous

context that "[e]mployers need not suspend previously planned transfers upon discovering that a

Title VII suit has been filed, and their proceeding along lines previously contemplated, though

not yet definitively determined, is no evidence whatever of causality."  *Clark Cnty. Sch. Dist.*,

532 U.S. at 272.

Defendants' argument, however, is undercut by JHU's own internal finding that Ms.

Richardson's Final Written Warning was the "first discipline she received."  Defs.' Ex. 31 at

SDR001058.  Moreover, the only evidence submitted in support of the claim that Ms. Hines and

Mr. Petasis began contemplating a Final Written Warning in June 2012 is Ms. Hines's self-serving affidavit in which she states that she advised Mr. Petasis to prepare one. *See* Hines Aff. ¶ 5. Defendants do not provide any testimony from Mr. Petasis or any contemporaneous evidence on this issue. Nor do Defendants offer any details as to whether Mr. Petasis or Ms. Hines took any action to prepare the Final Written Warning or whether they had any further discussions about it until after Ms. Richardson filed her EEOC complaint.

In any case, even to the extent that the value of the temporal proximity between Ms. Richardson's protected activity and the Final Written Warning is diminished for purposes of a causation analysis, Ms. Richardson has presented other evidence sufficient to support an inference of pretext and retaliation. The Court has already held that Ms. Richardson has presented sufficient evidence for a reasonable jury to find that Defendants' justifications for her suspension were pretextual, based largely on evidence indicating that JHU did not follow its normal procedures in issuing the Final Written Warning and indicating that Mr. Petasis presented at least one false justification for taking the action. That evidence even more strongly supports a finding of pretext here, since it is directly connected to the adverse action at issue. *See Allen*, 795 F.3d at 40 (stating that a plaintiff may prove an "invidious motive" of discrimination or retaliation by, among other things, pointing to evidence that "the employer is 'lying about the underlying facts' of its decision" and that "the employer failed to 'follow establish procedures or criteria'" (quoting *Brady*, 520 F.3d at 495)). In addition, the fact that the Final Written Warning occurred within days of the alleged removal of Ms. Richardson's supervisory duties and her reassignment to the Service Desk, actions that Defendants do not claim to have contemplated prior to Ms. Richardson's protected activity, further supports a finding of pretext. The record also indicates that Mr. Petasis and Ms. Hines were aware of Ms. Richardson's protected activity

when they issued her the Final Written Warning, and Defendants do not argue otherwise.  *See* Defs.' Ex. 30 at SDR000996; Pl.'s Ex. 9 at JHU00514.  The Court therefore concludes that Ms. Richardson has presented sufficient evidence for a reasonable jury to find that Defendants' proffered reasons for her Final Written Warning were not the real reasons and that the real reason was retaliation.

JHU is not entitled to summary judgment on this aspect of Ms. Richardson's retaliation claims.

### 5.  Suspension in December 2012

Ms. Richardson claims that her suspension on December 17, 2012 was also an act of unlawful retaliation.  The Court has already found that the suspension was an adverse employment action for purposes of Ms. Richardson's discrimination claim, and that analysis also suffices for finding that the suspension was a materially adverse action for purposes of a retaliation claim.  The remaining issue, therefore, is causation.

In her opposition to Defendants' motion for summary judgment, Ms. Richardson claims that she was suspended in retaliation for complaining to Mr. Petasis about his alleged battery of Mr. Daniel three days prior.  She does not, however, establish that her complaint to Mr. Petasis was statutorily protected activity.  The sole evidentiary support that Ms. Richardson provides for her claim that she complained to Mr. Petasis about his alleged battery of Mr. Daniel at all is one sentence from her affidavit in which she stated only:  "December 18, 2012, I spoke to Defendant Petasis regarding hitting Mr. Daniel."  Richardson Aff. ¶ 124.  Ms. Richardson does not provide any evidence whatsoever that her purported complaint to Mr. Petasis alleged that he struck Mr. Daniel with a racially discriminatory motive.  Her claim of retaliation on this basis, therefore, is without merit.

More compelling, however, is the proposition that Ms. Richardson was suspended in retaliation for her EEOC filings.  On October 17, 2012, Ms. Richardson filed a second EEOC charge, this time alleging retaliation.  *See* Richardson Aff. ¶ 110.  She was suspended just over two months later.  Defendants argue that Ms. Richardson cannot establish the necessary causation between her EEOC filing and her suspension, because the temporal proximity is not close enough.  *See* Defs.' Mem. Supp. at 30–31.  As support, Defendants rely upon the Supreme Court's approval in *Clark* of circuit cases that rejected temporal proximities of three and fourth months as evidence of causation, *see Clark Cnty. Sch. Dist.*, 532 U.S. at 273, as well as the D.C. Circuit's subsequent rejection of a two-and-one-half month time period as sufficient to infer a retaliatory motive in *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009).

Defendants' argument misses the mark.  First, of course, the temporal proximity here of two months is shorter than the temporal proximity in those cases.  In addition, the D.C. Circuit has since clarified that there is no bright-line rule with respect to temporal proximity.  *See Hamilton*, 666 F.3d at 1357–58 ("Although the Supreme Court has cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor this court has established a bright-line three-month rule.").  Indeed, the D.C. Circuit has explicitly interpreted its decision in *Taylor* as standing for the proposition that it "evaluate[s] the specific facts of each case to determine whether inferring causation is appropriate."  *Id.* at 1358 (citing *Taylor*, 571 F.3d at 1322).

Most importantly, Defendants' argument is premised on the false assumption that there is no other evidence supporting causation.  *See* Defs.' Mem. Supp. at 31 (arguing that Ms. Richardson cannot establish causation "[i]n the absence of any other evidence of causation").

The Court has already found, with respect to Ms. Richardson's claim that the suspension was discriminatory, that she has presented sufficient evidence for a reasonable jury to conclude that Defendants' proffered reasons for the suspension were pretextual.  Here, that analysis is only bolstered by the close temporal proximity between Ms. Richardson's second EEOC filing and the suspension, as well as the other alleged materially adverse actions.  It is also clear that Mr. Petasis, Ms. Hines, and Mr. Kunka were well aware of Ms. Richardson's protected activity before the suspension.  *See* Defs.' Ex. 30 at SDR000996; Pl.'s Ex. 9 at JHU00514.  For all these reasons, the Court finds that a reasonable jury could conclude that JHU suspended Ms. Richardson in retaliation for her protected activity.

Accordingly, JHU is not entitled to summary judgment as to this aspect of Ms. Richardson's retaliation claims.

### 6.  Constructive Discharge

Finally, the Court interprets Ms. Richardson's allegation of a constructive discharge as also falling within her retaliation claim under Count V of her Amended Complaint.  Though Defendants do not appear to treat it as so, "[r]etaliation can be the basis for a constructive discharge claim."  *Robinson v. Ergo Solutions, LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (citing *Carter*, 387 F.3d at 883).  The analysis for a constructive discharge claim on the basis of retaliation mirrors the analysis in the discrimination context.  *See id.*

The Court has already held, with respect to Ms. Richardson's discrimination claim, that Ms. Richardson has presented sufficient evidence for a reasonable jury to find that she was constructively discharged.  The Court has also held that she has presented sufficient evidence for a reasonable jury to conclude that Defendants removed her supervisory duties, reassigned her, gave her a Final Written Warning, and suspended her in retaliation for her protected activity.

The same analysis applies here, as those actions form the foundation for her constructive discharge claim. Accordingly, JHU is not entitled to summary judgment as to this aspect of Ms. Richardson's retaliation claims.

### E. Liability of the Individual Defendants for Aiding and Abetting

The Court has held that JHU is not entitled to summary judgment on the majority of Ms. Richardson's discrimination and retaliation claims in this action. In addition to these claims against JHU, Ms. Richardson also brings claims under the DCHRA against the Individual Defendants for aiding and abetting JHU's unlawful discrimination and retaliation. *See* Am. Compl. ¶¶ 133–40. The Court first addresses the legal standards for individual liability under the DCHRA's aiding and abetting provision and then addresses each Individual Defendant in turn.

### 1. The DCHRA's Aiding and Abetting Provision

Under the DCHRA, it is "an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of [the DCHRA] or to attempt to do so." D.C. Code § 2-1402.62. The case law concerning this provision of the DCHRA is underdeveloped, and the Court's application of the provision to this case is frustrated by the parties' failure to adequately address the issues. Nevertheless, the Court is guided by a limited set of decisions by the District of Columbia Court of Appeals and interpretations of the provision by courts of this District.

The leading case concerning the aiding and abetting provision is *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873 (D.C. 1998). In *Wallace*, the D.C. Court of Appeals held that partners of a law firm could be held individually liable under the DCHRA for both direct violations of the statute as "employers" and for aiding and abetting the law firm's discrimination by "carr[ying] out the allegedly discriminatory acts." *Id.* at 888. Looking to the

standards for aiding and abetting in the criminal context, the Court stated that "[a]n aider and abettor is one who 'in some sort associates himself with the venture, participates in it as something he wishes to bring about, and seeks by his action to make it succeed.'" *Id.* at 888 (quoting *Roy v. United States*, 652 A.2d 1098, 1104 (D.C. 1995) (internal punctuation omitted)). The Court explained that even if "the individual partners are not employers, and thus not principals in the alleged discrimination," they could be liable under the aiding and abetting provision if they "participated in the discrimination and sought to make it succeed." *Id.*

Most importantly with respect to this case, the Court in *Wallace* also cited with approval the Third Circuit's holding that, under an analogous Pennsylvania statute, a supervisor is liable for aiding and abetting sexual harassment if he knew or should have known about the harassment and refused to take prompt action to end it. *See id.* (citing *Dici v. Pennsylvania*, 91 F.3d 542, 553 (3d Cir. 1996)). Since *Wallace*, courts in this District have recognized that supervisors may be liable under the DCHRA for aiding and abetting if they knew or should have known about the discriminatory or retaliatory conduct and failed to stop it. *See Martin v. District of Columbia*, 968 F. Supp. 2d 159, 165 (D.D.C. 2013) (quoting *King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 332 (D.D.C. 2011)). As discussed in greater detail, *infra*, with respect to Ms. Richardson's claim against Ms. Grandval, the standard, if any, to be applied to a non-supervising co-worker is unclear.

Finally, of course, an individual cannot be liable under the aiding and abetting provision absent an underlying direct violation of the DCHRA. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (holding that because the employer did not discriminate against the plaintiff, it was clear that an individual defendant "did not aid and abet any unlawful discrimination"). Accordingly, the Individual Defendants are entitled to summary judgment with

respect to the two alleged retaliatory actions on which JHU is entitled to summary judgment: Mr. Petasis's yelling in January 2012 and Ms. Richardson's exclusion from a meeting in June 2012.

### 2. George Petasis

All of Ms. Richardson's surviving claims of discrimination and retaliation against JHU concern actions taken directly by Mr. Petasis:  his authorization of the removal of her supervisory duties, his decision to reassign her to the Service Desk, the issuance of her Final Written Warning, her suspension, and her constructive discharge.  Thus, on the record before the Court, a reasonable jury could conclude that Mr. Petasis "carried out the allegedly discriminatory acts" and therefore "aided and abetted the employer's discrimination" in violation of the DCHRA.  *Wallace*, 715 A.2d at 888.

Defendants' arguments to the contrary are limited.  They argue only that Mr. Petasis is entitled to summary judgment, because Ms. Richardson "has offered no evidence that his conduct was discriminatory."  Defs.' Mem. Supp. at 34.  As support, they cite Ms. Richardson's testimony during her deposition that she did not know Mr. Petasis's motivations for yelling at her for the first time in May 2011, her testimony in which she did not attribute Mr. Petasis's touching of her in September 2011 as racially motivated, and her testimony that Mr. Petasis never made a racially derogatory mark towards her.  *See id.* at 34–35.  This evidence, while certainly probative of whether Mr. Petasis's conduct was racially motivated, is inconclusive. The Court has already found that there is sufficient evidence in the record, including evidence of disparate treatment and evidence suggesting pretext, for a reasonable jury to conclude that Mr. Petasis's conduct was motivated by race.  Moreover, Defendants entirely fail to address whether Mr. Petasis was motivated by retaliation.

Accordingly, Mr. Petasis is not entitled to summary judgment for aiding and abetting any of the surviving claims against JHU.

### 3. Shanna Hines

As a preliminary matter, the Court must determine the legal standard to apply to Ms. Richardson's claims against Ms. Hines. Though Ms. Hines, as the Human Resources Manager, was not Ms. Richardson's direct supervisor, the Court finds, based upon the context of this case, that it is appropriate to apply the supervisory aiding and abetting standard to Ms. Hines, and Defendants do not argue otherwise. The Court's analysis is grounded in the record, which shows that Ms. Hines held a managerial function and was responsible for, in many respects, supervising Ms. Richardson's relationship with Mr. Petasis and that she counseled Mr. Petasis on disciplinary action against Ms. Richardson. The Court therefore considers whether a reasonable jury could find that Ms. Hines knew or should have known about discrimination or retaliation against Ms. Richardson and failed to stop it.

The record indicates that Ms. Hines was actively involved in Ms. Richardson's Final Written Warning and her suspension.[46] Ms. Hines even testified to her involvement in the decision to "go outside the standard disciplinary process" with respect to the Final Written Warning. Hines Dep. Tr. at 30:11–31:11, Pl.'s Ex. 5, ECF No. 42-8. The record also indicates that Ms. Richardson brought numerous complaints regarding Mr. Petasis's allegedly harassing conduct to Ms. Hines's attention, and Ms. Richardson alleges that Ms. Hines failed to take action

---

[46]   *See, e.g.,* Hines Aff. ¶ 5 (stating that she advised Mr. Petasis to prepare the Final Written Warning); Defs.' Ex. 30 at SDR000996 (letter from Mr. Kunka stating that Ms. Richardson received the Final Written Warning in a meeting with Mr. Petasis and Ms. Hines); Defs.' Ex. 32 (letter signed by Ms. Hines informing Ms. Richardson of her suspension and its asserted reasons).

in response to stop the conduct.[47]  Ms. Richardson has also presented evidence that Ms. Hines

told JHU's internal investigators during the appeal of Ms. Richardson's Final Written Warning

that "she viewed Mr. Petasis' behavior as a risk from a HR perspective."  Pl.'s Ex. 9 at

JHU00510.  This evidence provides sufficient grounds for a reasonable jury to find that Ms.

Hines knew about or should have known about the alleged discrimination and retaliation against

Ms. Richardson and may even support a finding that she helped carry out at least some of the

alleged discrimination and retaliation.  There is no evidence, however, indicating that Ms. Hines

knew about or had any role with respect to the alleged removal of Ms. Richardson's supervisory

duties or her reassignment to the Service Desk.

Defendants' arguments with respect to Ms. Hines are also limited and focus exclusively

on discrimination, ignoring retaliation.  In their brief filed in support of their motion, Defendants

argue only that Ms. Hines is entitled to summary judgment because Ms. Richardson testified

during her deposition that Ms. Hines never made a racially derogatory remark and that she did

not know why Ms. Hines allegedly failed to schedule a meeting in response to a complaint that

Ms. Richardson made.  *See* Defs.' Mem. Supp. at 33.  As with respect to Mr. Petasis, this

---

[47]  *See, e.g.,* Hines Aff. ¶ 4 (stating that she met with Ms. Richardson and Mr. Petasis in February 2012 "to try to help them resolve their conflict"); Defs.' Ex. 11 (March 2012 e-mail from Ms. Richardson to Ms. Hines following up on the February 2012 meeting); Richardson Aff. ¶ 26 (stating that Ms. Hines told her that "she is tired of getting complaints about George, Myron's not doing anything"); *id.* ¶ 33 (alleging that Ms. Hines "ignored my meeting requests"); *id.* ¶ 154 (alleging that Ms. Hines responded to a complaint about Mr. Petasis by stating that "George is just being petty"); Pl.'s Ex. 9 at JHU00510 (internal investigative report stating that "Ms. Hines stated that Ms. Richardson described her interactions with Mr. Petasis as 'being in an abusive relationship or marriage'"); *id.* at JHU00512 ("[Ms. Hines] said she would meet with Ms. Richardson and Mr. Petasis regularly."); *id.* ("Ms. Hines alleged that Ms. Richardson would say that she had to respect the position, not the person in the position, that she was a 'watchdog' for others, and that she 'wanted a harassment free workplace.'"); *id.* at JHU00515 ("Ms. Hines was asked if she was an advocate of Mr. Petasis.  She responded that she was an advocate in that she saw the side of Ms. Richardson that Mr. Petasis got.").

evidence, while probative, does not entitle Ms. Hines to summary judgment and does not address the issue of whether Ms. Hines had knowledge of the alleged discrimination and retaliation and whether she attempted to stop it.[48]

Accordingly, Ms. Hines is not entitled to summary judgment with respect to her alleged aiding and abetting of the Final Written Warning, suspension, hostile work environment, and constructive discharge.  She is entitled to summary judgment with respect to the removal of Ms. Richardson's supervisory duties and Ms. Richardson's reassignment to the Service Desk.

### 4.  Myron Kunka

The supervisory aiding and abetting standard is also applicable to Mr. Kunka, who was responsible for overseeing both the Office of Information Technology and Human Resources, and Defendants do not argue otherwise.

The record indicates that Mr. Kunka's involvement in or awareness of the alleged discriminatory and retaliatory conduct was more limited than the other Individual Defendants.  Mr. Kunka participated in the meeting with Ms. Hines and Ms. Richardson on September 29, 2011, in which they discussed Ms. Richardson's general complaints about Mr. Petasis's behavior and his use of the term "boys" to refer to male staff members.  *See* Defs.' SOF ¶ 22; Defs.' Ex. 8.

---

[48]     The Court notes that Defendants partly address this issue in their reply brief, arguing that Ms. Richardson has "at most . . . establish[ed] that Hines understood Petasis to pose a possible risk to SAIS because he was a bad manager, not that she thought he posed a possible risk because he was engaging in discriminatory conduct."  Defs.' Reply at 21–22.  "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief."  *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011) (quoting *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)).  In any event, the Court does not share this narrow view of the record and observes that Defendants still fail to address whether Ms. Hines was aware of the alleged retaliation.  The Court also notes that, though Ms. Hines is of the same race as Ms. Richardson, Defendants do not offer this fact as grounds for granting judgment in favor of Ms. Hines for aiding and abetting the discrimination.  The Court does not raise this issue on its own.

The Court has found, however, that neither Ms. Richardson's statements during that meeting nor Mr. Petasis's use of the word "boys" support her claims of discrimination or retaliation.

It is unclear what further involvement, if any, Mr. Kunka had prior to the issuance of Ms. Richardson's Final Written Warning in September 2012. The record indicates that Ms. Hines stated during the internal appeals process that she recommended to Mr. Kunka that "Mr. Petasis get an Executive Coach or attend the Leadership Development program" but that "Mr. Kunka was resistant to her guidance and that he spoke to Mr. Petasis about his style." Pl.'s Ex. 9 at JHU00510. *See also* Richardson Aff. ¶ 26 (stating that Ms. Hines told her that "she is tired of getting complaints about George, Myron's not doing anything"). It is unclear, however, when this occurred.

In his letter upholding the Final Written Warning on October 24, 2012, Mr. Kunka stated that he was involved in the preparation of the Final Written Warning. *See* Defs.' Ex. 30 at SDR000996 ("The final written warning was prepared after thoughtful consideration, deliberation and in consultation with the Office of the General Counsel, Human Resources, and me."). He also stated in the letter that he was "fully aware of the formal complaints you have filed with Johns Hopkins University's (JHU) Office of Institutional Equity (OIE) and the U.S. Equal Employment Opportunity Commission (EEOC) against JHU Paul H. Nitze School of Advanced International Studies (SAIS) alleging harassment, discrimination based on gender and race and retaliation." *Id.* The Court is unable to locate evidence in the record concerning Mr. Kunka's involvement in Ms. Richardson's suspension, but, given his self-described level of involvement in Ms. Richardson's Final Written Warning, it would be reasonable to infer that he should have known about it. There is no evidence that he knew about or should have known

about the alleged removal of Ms. Richardson's supervisory duties or her reassignment to the Service Desk.

This evidence provides sufficient grounds for a reasonable jury to find that, with respect to the Final Written Warning, suspension, alleged hostile work environment, and constructive discharge, Mr. Kunka knew about or should have known about the alleged discrimination and retaliation against Ms. Richardson and that he failed to stop it.  Again, Defendants' arguments with respect to Mr. Kunka are weak, citing only Ms. Richardson's testimony during her deposition that Mr. Kunka was in a position of authority with a responsibility to protect employees from harm, that he "concur[ed]" with the discrimination and constructive discharge, that he did not respond to her requests for a meeting, and that she understood from Ms. Hines that he was aware of Mr. Petasis's behavior. Defs.' Mem. Supp. at 32–33 (quoting Defs.' SOF ¶ 74).  Defendants do not challenge Ms. Richardson's factual claims.  Instead, they argue that Ms. Richardson has presented "no other evidence that Kunka was motivated by racial animus" and that Ms. Richardson acknowledged that Mr. Kunka did not make any racially derogatory comments to her in her presence.  As with respect to Ms. Hines, Defendants fail address the central issue of whether Mr. Kunka knew about or should have known about the alleged discriminatory and retaliatory conduct and whether he did anything to stop it.  Defendants also focus exclusively on the discrimination claims and ignore the issues in this case concerning retaliation.

Accordingly, Mr. Kunka is not entitled to summary judgment with respect to his alleged aiding and abetting of the Final Written Warning, suspension, hostile work environment, and constructive discharge.  He is, however, entitled to summary judgment with respect to the

removal of Ms. Richardson's supervisory duties and Ms. Richardson's reassignment to the Service Desk.

### 5.  Deborah Grandval

It is clear that Ms. Grandval was not responsible for supervising Ms. Richardson or Mr. Petasis.  Indeed, Ms. Richardson explicitly argues that "Defendant Grandval was not Plaintiff's supervisor," Pl.'s Opp. at 5, and a significant piece of evidence in support of Ms. Richardson's discrimination claims—Mr. Petasis's disparate treatment of Ms. Grandval—hinges on Ms. Richardson's factual claim that she and Ms. Grandval were similarly situated employees.  It is therefore improper to apply the aiding and abetting standard for supervisors, which imposes a duty to end any known discriminatory or retaliatory practices, on Ms. Grandval, as Ms. Richardson appears to suggest.  *See* Pl.'s Opp. at 34 ("Defendants Hines, Kunka, and Grandval were all aware of what was happening and did nothing to intervene.").  After all, under this theory, it would seem that virtually any employee of SAIS familiar with the relationship between Mr. Petasis and Ms. Richardson who failed to act could be liable for aiding and abetting in this case.  But the statute does not seem to reach such co-worker liability.

Although the parties do not address the issue, it is not entirely clear whether Ms. Grandval, as a non-supervisory co-worker, may be liable at all for aiding and abetting under the DCHRA.  Though the statute prohibits "any person" from aiding and abetting unlawful discrimination or retaliation, the Court observes that, to the Court's knowledge, the provision has never been applied to any individual employees except for supervisors and upper management. *See, e.g., Purcell v. Thomas*, 928 A.2d 699, 714–16 (D.C. 2007) (applying the DCHRA as a whole to the president, chief operating officer, controlling shareholder, and director of the employing entity); *Wallace*, 715 A.2d at 888–89 (applying the statute to partners of a law firm);

*Martin*, 968 F. Supp. 2d at 164–65 (applying the aiding and abetting provision to the chairman of the board responsible for overseeing the employing regulatory agency).  The Court also notes that federal district courts have held that Pennsylvania's aiding and abetting statute, which the D.C. Court of Appeals considered to be a counterpart to the DCHRA in *Wallace*, only permits liability for supervisors.  *See, e.g., Holocheck v. Luzerne Cnty. Head Start, Inc.*, 385 F. Supp. 2d 491, 497 (M.D. Pa. 2005) ("Supervisory employees, however, may be held liable under § 955(e) on the theory that only supervisors can share the discriminatory purpose and intent of the employer that is required for aiding and abetting.").  Nevertheless, given Defendants' failure to raise this argument and the lack of developed case law in this area, the Court assumes without deciding that the aiding and abetting provision is applicable to Ms. Grandval in this case.

The Court thus considers whether Ms. Richardson has presented sufficient evidence for a reasonable jury to find that Ms. Grandval associated herself with JHU's allegedly discriminatory and retaliatory practices, participated in those practices as something that she wished to bring about, and sought by her actions to make them succeed.  *See Wallace*, 715 A.2d at 888.  Though Ms. Grandval plays an important role in Ms. Richardson's factual claims, there is little evidence in the record to suggest that she intentionally acted to effect or further JHU's alleged discrimination and retaliation.  For example, Ms. Richardson alleges that Ms. Grandval yelled at her, threatened to hurt her, threatened to take her job, and then assumed her supervisory duties at the direction of Mr. Petasis, but she does not provide any evidence showing that Ms. Grandval was motivated by discrimination in taking any of these actions.  Indeed, Ms. Richardson makes no such argument based on the record in her brief opposing summary judgment, and, when asked during her deposition what facts she relied upon to form her belief that Ms. Grandval was motivated by racial animus, she discussed Ms. Grandval's time living in Europe and that she

"didn't have any black friends, and yet she wanted [me] to move in with her because she thought we would get along."  Richardson Dep. Tr. at 327:10–18.  No reasonable jury could find based on this evidence that Ms. Grandval was motivated by racial animus.

In her brief opposing summary judgment, Ms. Richardson takes the alternate position that Ms. Grandval is not entitled to summary judgment for aiding and abetting, because she was "simply the cat's paw or the conduit of Defendant Petasis's prejudice."  Pl.'s Opp. at 34.  But there is no legal authority suggesting that any employee who serves merely as a passive "conduit" of her supervisor's discrimination—while having no discriminatory animus herself—is liable for aiding and abetting.  Ms. Richardson's reference to the "cat's paw" theory and her unexplained citation to the Supreme Court's discussion of that theory of liability in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), is also misguided.  *See* Pl.'s Opp. at 34.  First, the Court notes that although several federal courts of appeal have applied *Staub* to Title VII actions, the D.C. Court of Appeals has not yet applied the theory to the DCHRA.  *See Bryant v. District of Columbia*, 102 A.3d 264, 268 n.3 (D.C. 2014).  Even assuming the theory is applicable here, it is wholly inapplicable to Ms. Grandval.  If the cat's paw theory was applied to the DCHRA, under the Supreme Court's definition in *Staub*, it would be as follows:  "if a supervisor performs an act motivated by [discriminatory or retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [DCHRA]."  562 U.S. at 422 (emphasis in original).  Ms. Richardson has this theory exactly backwards.  Here, she is attempting to hold Ms. Grandval liable for the discriminatory intent of her employer, rather than the other way around.

Finally, Ms. Richardson has not presented any evidence indicating that Ms. Grandval had any role in issuing Ms. Richardson's Final Written Warning, reassigning her to the Service Desk,

suspending her, or constructively discharging her.  Nor has Ms. Richardson presented any

evidence that Ms. Grandval harbored any retaliatory animus, let alone that she knew of Ms.

Richardson's protected activity.

Ms. Grandval, therefore, is entitled to summary judgment on the entirety of Count IV.


## IV.  CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART AND DENY IN PART**

Defendants' Motion for Summary Judgment (ECF No. 40).  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.


Dated:  December 7, 2015                                      RUDOLPH CONTRERAS
                                                                        United States District Judge